MILTON E. HARRIS, Plaintiff and Appellant, v. CAPITOL RECORDS DISTRIBUTING CORPORATION et al., Defendants and Respondents.

456

Naiditch & Gould, Louis Naiditch, Morton H. Gould, Robert L. Brock and Irwin Chasalow for Plaintiff and Appellant.

Moses Lasky, Richard Haas, Robert S. Daggett, Brobeck, Phleger & Harrison, Robert E. Carp, Elliot Chaum, Gibson, Dunn & Crutcher, Frederic H. Sturdy, Irwin F. Woodland, O'Melveny & Myers, Homer I. Mitchell, Allyn O. Kreps and James V. Delong for Defendants and Respondents.

MOSK, J.—Plaintiff appeals from a summary judgment entered in favor of defendants Capitol Records Distributing Corporation, Columbia Records Distribution Corporation, and RCA Victor Distributing Corporation, in an action for damages and injunctive and declaratory relief under the California Unfair Practices Act (hereinafter called the Act). (Bus. & Prof. Code, §§ 17000-17101.)

We need not undertake the usual task of analyzing the conflicting declarations filed in support of and in opposition to the motion for summary judgment to determine whether there is a triable issue of fact (see, e.g., *Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785]), for there is no legal theory upon which these defendants can be held liable to plaintiff. ▮ As will appear, the Unfair Practices Act does not apply to the situation here presented.

Plaintiff owns and operates a retail phonograph records store on Hollywood Boulevard in Los Angeles. He buys his inventory from Capitol, Columbia, RCA, and similar distributors, at the standard dealer discount of 38 percent off list price. Harry Dale, doing business under the name of Guaranteed Record Sales, is known as a rack-jobber. ▮ In this commercial field a rack-jobber is a subdistributor who purchases records from distributors and places them in self-service

racks in supermarkets, drugstores, and similar retail outlets in which the sale of records is only an incidental item. He is given the standard 38 percent dealer discount, plus an additional 10 percent off the remaining cost (i.e., a total discount of 44.2 percent off list) because of his extra expenses in supplying and servicing the racks.

In May 1963 Dale opened a retail record store of his own, called Master Music Mart, across the street from plaintiff's store, and proceeded to advertise and sell Capitol, Columbia, and RCA records at 50 percent off list price. Plaintiff brought this suit against Dale, Master Music Mart, Capitol, Columbia, and RCA, alleging that Dale was allowed to buy his stock at a rack-jobber's discount and to sell it as a retailer through Master Music Mart, thus enabling him to undersell plaintiff and damage his business.

Motions for summary judgment by Dale and Master Music Mart were denied, and a temporary injunction was issued against each. Perhaps victims of their own pricing practices, however, Dale and Master Music Mart subsequently became insolvent and the action was dismissed as to them. Motions for summary judgment by Capitol, Columbia, and RCA (hereinafter called defendants) were granted, and plaintiff appeals. Since there are no factual conflicts of consequence, we shall refer at some length to the parties' conflicting interpretations of the law.

Plaintiff first contends that by selling to him at one price and to Dale at another, defendants created an unlawful "locality discrimination" in violation of Business and Professions Code sections 17040[1] and 17031.[2] A difficult question of statutory interpretation is presented by plaintiff's argument that in spite of the "geographical" overtones of the language of section 17031, in its present form it in effect pro-

[1] "It is unlawful for any person engaged in the production, manufacture, distribution or sale of any article or product of general use or consumption, with intent to destroy the competition of any regular established dealer in such article or product, or to prevent the competition of any person who in good faith, intends and attempts to become such dealer, to create locality discrimination.

"Nothing in this section prohibits the meeting in good faith of a competitive price."

[2] "Locality discrimination means a discrimination between different sections, communities or cities or portions thereof, or between different locations in such sections, communities, cities or portions thereof in this State, by selling or furnishing an article or product, at a lower price in one section, community or city, or any portion thereof, or in one location in such section, community, or city or any portion thereof, than in another."

hibits discrimination between sales to different individual *purchasers* in the same location, as well as discrimination between sales in different geographical *locations*.

Defendants dispute this conclusion, and begin with a historical analysis of the legislation in question. Relying on decisions of our sister jurisdictions construing similar statutes (e.g., *State* v. *Drayton* (1908) 82 Neb. 254 [117 N.W. 768, 130 Am.St.Rep. 671, 23 L.R.A. N.S. 1287]; *State* v. *Central Lumber Co.* (1909) 24 S.D. 136 [123 N.W. 504, 42 L.R.A. N.S. 804], affd. (1912) 226 U.S. 157 [33 S.Ct. 66, 57 L.Ed. 164]), defendants assert that the intent of the Legislature in enacting the Unfair Practices Act in its original form (Stats. 1913, p. 508) was to prevent a monopolistic practice by which a large retail chain would lower its prices at a store in one area, constituting a severable market, until the competition from smaller, local businesses in that community had been eliminated, concurrently offsetting the losses it thus suffered by charging higher prices in its other areas of operation. After the demise of competitors, the chain outlet would then realize monopoly profits, and the procedure of attrition would be repeated elsewhere. Defendants urge that in its present form the Act is still designed to serve similar purposes, relying in this connection on the statutory declaration of legislative intent.[3]

Plaintiff responds by stressing an assertedly significant addition to the original language of the Act. The 1913 statute spoke only of discrimination "between different sections, communities or cities or portions thereof of this state," making no use of the present word, "locations." The latter was added when the statute was rewritten in 1931 (Stats. 1931, p. 1333), and it now forbids discrimination "between different sections, communities or cities or portions thereof, *or between different locations in* such sections, communities, cities or portions thereof in this State." (Italics added.) "Locations," plaintiff concludes, must refer to the site of individual stores or outlets within any such geographical area. Defendants are hard put to provide a different definition of the word "locations," but suggest that it means separate business districts

---

[3]Section 17001 (based on Stats. 1913, p. 510) recites as follows: "The Legislature declares that the purpose of this chapter [i.e., the Unfair Practices Act] is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented." Section 17002 declares that the chapter is to be "liberally construed."

within the same city. Plaintiff replies, however, that the latter category was already adequately covered by the word "portion" in the original language, "sections, communities or cities *or portions thereof*," and argues that the Legislature will not be presumed to have committed the idle act of adding redundancy to the statute.[4]

It is difficult to leap, however, from discrimination between individual stores or outlets, to discrimination between individual purchasers. Plaintiff has not demonstrated how the gap can logically be bridged, and to this extent the word "location" must be deemed to retain a geographic connotation. Defendants point up the distinction by a comparative analysis of the California Unfair Practices Act and the federal Robinson-Patman Act (15 U.S.C. §§ 13, 13a, 13b, 13c, 21a). In two separate sections the federal statute prohibits price discriminations either "between different purchasers" (15 U.S.C. § 13, subd. (a)) or between different "parts of the United States" (15 U.S.C. § 13a). Defendants argue that if the California Legislature had intended our statute to cover the former kind of discrimination, it could have said so in very few words. An opportunity was presented in 1941, for example, when the Unfair Practices Act was codified into the Business and Professions Code (Stats. 1941, pp. 1839-1846). At that time the single section 1 of the former Act was divided, the prohibition against "locality discriminations" being codified in section 17040, and the definition of that term being codified in section 17031. Defendants reason that if the Legislature had simply intended to prohibit discrimination between purchasers it would have been absurd for it to reemphasize the heavy baggage of language by which "locality discrimination" is first prohibited and then defined in such a manner as to assertedly eliminate the element of locality.[5]

There are no published judicial opinions on the matter, but defendants cite us to two trial court decisions which have held

[4]Plaintiff's reliance on the language of certain other sections of the Act (e.g., §§ 17042, 17045, and 17050) is misplaced, as each is equally compatible with a "geographical" view of the matter.

[5]Defendants also stress the fact that although the California Legislature has adopted many provisions of the federal antitrust statutes, as recently as 1961 it declined to enact a measure (Assembly Bill 2368) which would have repealed sections 17040 and 17031 and would have incorporated the substance of the Robinson-Patman Act into our law, including its prohibition against price discrimination "between different purchasers." By contrast, as of 1938 seven states specifically prohibited discrimination between purchasers as well as between localities. (Comment (1938) 32 Ill.L.Rev. 816, 820, fn. 34.)

that "locality discrimination" means discrimination between sales in different geographical locations rather than between sales to different purchasers in the same location. (*Hardware Centers, Inc.* v. *Blue Chip Stamp Co.* (1963) Los Angeles Superior Court No. 804308; *Millage* v. *Interstate Bakeries Corp.* (1957) San Bernardino Superior Court Nos. 84573 and 85262.) What little secondary authority there is, is sharply divided. Some writers have found that the 1931 addition of the term "locality" to the Act had no effect on its scope (e.g., Cupp, *The Unfair Practices Act* (1936) 10 So.Cal.L.Rev. 18, 23-24), while others have concluded to the contrary (e.g., Legal Aspects of Competitive Business Practices (Cont.Ed. Bar 1961) p. 278).

If anything emerges from the foregoing contentious volleying, it is that there remains ample room for legislative clarification. As section 17031 is presently worded, we conclude that the smallest geographic unit it envisages is the individual store or outlet, not the individual purchaser regardless of location. But even when the section is thus construed, it is of no relevance to plaintiff's cause of action. Sections 17040 and 17031 prohibit selling "at a lower price . . . *in* one location . . . than *in* another." (Italics added.) The clear import of this language is that to fall within its prohibition a seller must have at least two different places of business and must sell at a lower price *in* one than *in* the other. The two outlets involved in the present case are owned not by the defendant wholesale record distributors but by their retail customers, plaintiff and Dale.

This distinction leads us to defendants' related contention that section 17040 is intended to apply only to competition on the same "level" as the person allegedly creating the locality discrimination (i.e., "primary" competition), rather than to competition between those who purchase from the alleged discriminator (i.e., "secondary" competition).

The point is well taken. As stated in *Millage* v. *Interstate Bakeries Corp.* (1957) *supra,* "Section 17040, which prohibits locality discriminations, applies only to such discriminations as are made with intent to destroy the competition of a dealer who competes with the person creating the discrimination, i.e., the person engaged in the *sale* who creates the discrimination by *selling* at a lower price. In other words, the Legislature did not intend to declare unlawful a sale at a lower price in one locality than in another where there was no

intent to destroy competition with the person who was making the sale.''

The rationale behind the *Millage* construction of section 17040 is not hard to find. As the court there observes, ''This interpretation is apparent from that portion of the section in question which provides: 'Nothing in this section prohibits the meeting in good faith of a competitive price.' A wholesaler is not in competition with a retailer. The lowering of the price of a wholesaler in one locality would not be made with intent to meet the competitive price of a retailer in those sections. There is no competition between them.''[6]

■ Throughout the Act the Legislature has manifested its intent to discourage practices which injure the seller's competitors (§§ 17040, 17043, 17045, 17071) and thereby tend to create the monopolies condemned by section 17001 (*ante*, fn. 3). Equally apparent is the Legislature's concern to allow the seller to meet in good faith the prices of his competitors (§§ 17040, 17050), thereby fostering the competition promoted by section 17001. Together these constitute the ''horizontal'' concept of price regulation, one of the fundamental characteristics of this legislation. In his exhaustive study entitled *Experience in California With Fair Trade Legislation Restricting Price Cutting* (1936) 24 Cal.L.Rev. 640, 686, Professor Ewald T. Grether explained: ''Whereas the Fair Trade Law has to do with *vertical* price relations, the Unfair Practices Act operates *horizontally*.'' (Italics in original.) And in Cupp, *The Unfair Practices Act* (1936) *supra*, 10 So.Cal. L.Rev. 18, the author said that ''The act may be said to be the consummation of years of effort by businessmen to carry out the horizontal concept of trade regulation.'' More recently, it has been pointed out that under *Millage* the Unfair Practices Act ''protects only first-line competition against predatory price cutting on an area basis and does not make illegal price discriminations which only injure second or third-line competition at the buyer level or lower. ... [A] seller can lawfully discriminate in favor of one of his purchasers for the purpose of enabling that purchaser to meet his competition,

---

[6] In this connection we should accept at face value the assertion in the affidavit of the vice-president and general manager of Capitol, filed in support of the motion for summary judgment, that ''[Capitol] is not in competition with plaintiff, and it is to the economic interest of [Capitol] that plaintiff be not injured and that he prosper, because plaintiff is a valued customer of [Capitol].'' Plaintiff does not deny or controvert this assertion, and it is in accord with business commonsense.

so long as there is no intent on the part of the seller to prevent or destroy the competition of other sellers at his level." (Bermingham, *Legal Aspects of Petroleum Marketing Under Federal and California Law* (1960) 7 U.C.L.A. L.Rev. 161, 246-247.)

Plaintiff complains that this construction of the Act will allow a predatory company "to vertically feed on those beneath it." Such arguments should be addressed to the Legislature, which alone is equipped to determine the gravity of the economic evil here alleged, and to take such steps as it deems appropriate.[7]

The second theory upon which plaintiff seeks to hold these defendants liable is that Dale sold records at less than his cost, in violation of section 17043,[8] and that defendants "participated jointly or colluded" in such activity, in violation of section 17048.[9]

Plaintiff contends, in effect, that defendants "had reason to know" from various conversations with Dale that the latter intended to sell at retail the records he would buy from them at a rack-jobber's discount, and they took no action to prevent him from doing so. ■ But the fact that defendants "had reason to know" that Dale was selling at retail as well as at wholesale is insufficient as a matter of law to establish that defendants were guilty of collusion or conspiracy with Dale in this activity. To be a conspirator one must share a common purpose with another, not merely suspect or have knowledge of the other's own private purpose. ■ When, as here, the goods are not contraband or illegal or restricted commodities, a distributor may sell to a jobber-retailer even though he may have "reason to know" that the latter intends to resell below cost. (Compare *United States* v. *Falcone* (1940) 311 U.S. 205 [61 S.Ct. 204, 85 L.Ed. 128], with *Direct Sales Co.* v. *United States* (1943) 319 U.S. 703 [63 S.Ct. 1265, 87 L.Ed. 1674].)

---

[7]We do not mean to suggest that steps should be taken to extend the scope of the Unfair Practices Act. Indeed, it has recently been said that "If the State of California truly wishes to pursue an enlightened policy of consumer protection, the most effective single step in this direction would be to repeal the Unfair Practices Act." (Barron, *California Antitrust—Legislative Schizophrenia* (1962) 35 So.Cal.L.Rev. 393, 405.) In any event, the matter is clearly within the legislative sphere.

[8]"It is unlawful for any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition."

[9]"It is unlawful for any manufacturer, wholesaler, distributor, jobber, contractor, broker, retailer, or other vendor, or any agent of any such person, jointly to participate or collude with any other such person in the violation of this chapter."

█ Indeed, a vendor is generally prohibited by law from conditioning his sale to a vendee on an agreement by the latter to maintain a minimum resale price; to do so would violate the Sherman Act and the Cartwright Act, unless of course the vendor "fair traded" the product. But as Capitol correctly observes, "it would be strange statutory construction of the Unfair Practices Act that compelled a vendor, in order to protect himself against a charge of collusion with one vendee who sold at a low price with the necessary predatory intent, to blanket all his vendees with a 'fair trade' resale price fix, preventing them from giving the public the benefit of low prices."

For its evidence that defendants not only knew about Dale's sales at retail but also "participated" therein, plaintiff points to the fact, asserted in his affidavits, that each defendant granted him an "advertising allowance" for the purpose of defraying the cost of advertising its own brand of record. █ But advertising allowances are special benefits that would fall, if at all, under the terms of section 17045, which outlaws "The secret payment or allowance of rebates, refunds, commissions, or unearned discounts . . . or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions. . . ." The section is inapplicable here for two reasons: first, the allowance was not secret, and each defendant's trademark appeared on the face of the advertisement; and second, such allowances were not discriminatory but were "extended to all purchasers purchasing upon like terms and conditions," as permitted by section 17045.

█ Finally, in his cause of action for declaratory relief plaintiff seeks an adjudication that the status of rack-jobber is not a legitimate functional classification entitled to differential price treatment. The statute, however, provides otherwise: a pricing structure in which a distributor sells to a retailer at one discount and to a rack-jobber at another is expressly permitted by section 17042.[10] █ Responsibility for the difficulties involved here rests primarily on Dale, rather than on any of the three distributing companies which provided him records on the same terms as they sold to all similar subdistrib-

---

[10]"Nothing in this chapter prohibits any of the following: . . . (b) A functional classification by any person of any customer as broker, jobber, wholesaler or retailer. (c) A differential in price for any article or product as between any customers in different functional classifications."

utors. The injury of which plaintiff complains was caused not by any unlawfulness of the functional classification of rack-jobber, but by Dale's misuse of that classification for his own ends. The cause of action for declaratory relief is thus unsupported by any facts in plaintiff's declarations.

The judgment is affirmed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Peek, J., and Burke, J., concurred.