**USA PETROLEUM COMPANY,**
Plaintiff,

v.

**ATLANTIC RICHFIELD COMPANY,**
Defendant.

No. CV 83–3508–WPG.

United States District Court,
C.D. California.

Dec. 15, 1983.

Blecher, Collins & Weinstein by Norman Pine, Consuelo Woodhead, Los Angeles, Cal., for plaintiff.

Hughes, Hubbard & Reed by Ronald Redcay, Los Angeles, Cal., for defendant.

## MEMORANDUM OF DECISION

WILLIAM P. GRAY, District Judge.

### FACTUAL STATEMENT

On May 27, 1983, USA Petroleum Company ("USA" or "plaintiff") filed suit against Atlantic Richfield Company ("Arco" or "defendant") alleging various violations of federal and state antitrust laws and California trade statutes. Specifically, USA, an independent marketer of refined gasoline, contends that Arco, an integrated petroleum producer and refiner primarily engaged in selling gasoline at the wholesale level, artificially "subsidized" low retail gasoline prices in an attempt to eliminate independent retailers, including USA, as competitors in the sale of gasoline. Arco allegedly pursued this objective in concert with its "branded" dealers and distributors (dealers and distributors marketing Arco gasoline under the Arco brand name), by employing unlawful practices, including:

—organizing a resale price maintenance scheme as a result of which the retail prices of Arco gasoline were fixed, stabilized and maintained at an allegedly low and anticompetitive level;

—implementing severe and predatory price cuts;

—selling gasoline and other refined products below cost, sometimes as a loss leader;

—selling gasoline and other refined products at an uncompetitively low level, even if not below cost;

—using price allowances to facilitate control by Arco of retail gasoline prices and to protect Arco-branded dealers and distributors;

—manipulating crude oil "transfer prices" and deliberately underpaying

federal windfall profit taxes and state taxes so as to enable Arco to maintain artificially low prices;

—purchasing crude oil at high spot-market prices in order to deprive the independent refiners of their supply and refusing to sell to independent marketers;

—engaging in several forms of price discrimination in order to destroy the independents; and

—threatening, intimidating and coercing dealers and distributors to comply with the aforementioned acts.

Based upon this alleged misconduct, USA asserts eleven counts of antitrust violations, three under federal law and eight under state law, including the following:

—Count I: a vertical conspiracy between Arco and its dealers and distributors to restrain trade in violation of Section 1 of the Sherman Act;

—Count II: attempted monopolization of the market in violation of Section 2 of the Sherman Act;

—Count III: price discrimination in the sale of gasoline in violation of the Robinson-Patman Act;

—Counts IV through XI: state law claims alleging violations of various statutes, including the California Cartwright Act (Count IV) and the California Business and Professional Code (Counts V–XI).

## I. INTRODUCTION

This memorandum shall address four separate and distinct arguments espoused by the defendant, Arco, in support of its motion to dismiss this action.

In general, the dismissal of an action is justified when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The application of this principle to the present complex and extensive antitrust action poses an especially acute need to balance the plaintiff's right to conduct discovery and pursue a legitimate cause of action against the defendant's right to protection from unjustified voluminous discovery and other burdens resulting from frivolous litigation. In striking this balance, the court is cognizant of the Supreme Court's comments in a similarly broad antitrust action: "[I]n a case of this magnitude, a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* —— U.S. ——, 103 S.Ct. 897, 903, fn. 17, 74 L.Ed.2d 723, 732, fn. 17 (1983).

## II. ALLEGATIONS OF TAX UNDER- PAYMENT

■ Arco contends that Counts I, II, IV, V and XI of USA's complaint should be dismissed as an improper attempt to adjudicate in this forum the issue of Arco's federal and state tax liability.[1] In reality, however, Arco's alleged underpayment of taxes constitutes only one of many practices detailed in these counts of the complaint as evidence of Arco's overall predatory pricing scheme. Thus, any decision to strike the complaint's reference to Arco's tax underpayment would not mandate the dismissal of the predatory pricing claims in their entirety.

■ Furthermore, this court is not persuaded by Arco's arguments in favor of striking the references in the pleadings to the alleged tax underpayment. As Arco correctly notes, the threshold inquiry in a predatory pricing claim focuses on the relationships between the prices and costs anticipated by the defendant at the time the pricing decisions are made. *See, e.g., William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014,

---

1. In support of this contention Arco refers to allegations in the complaint wherein USA claims that "Arco has artificially manipulated crude oil transfer prices and has deliberately underpaid federal windfall profit taxes and state taxes so as to subsidize the maintenance of artificially low refined product prices."

1034 (9th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982) (requiring evaluation of anticipated benefits of prices "at the *time they were set* "); *California Computer Products, Inc. v. International Business Machine Corp.,* 613 F.2d 727, 740 n. 19 (9th Cir.1979) (identifying "profit expectations *at announcement or introduction of a product at a particular price*" as the primary consideration in analyzing a firm's pricing behavior) (emphasis added). This proposition, however, merely reaffirms the relevance of the plaintiff's attempt to demonstrate Arco's *deliberate* underpayment of taxes as part of its overall program to subsidize and maintain refined product prices at an artificially low level. These allegations clearly emphasize the purported intentional and knowing underpayment of taxes and involve the calculation of the amount of taxes Arco thought or knew it needed to pay at the time its pricing decisions were made. Consequently, this court is not being asked, nor is it willing, to adjudicate the issue of Arco's actual or correct tax liability.[2]

In light of the foregoing, this court declines either to dismiss the plaintiff's predatory pricing claims or to strike the references in the complaint to Arco's alleged underpayment of taxes. The issue of Arco's knowing and deliberate underpayment of state and federal taxes constitutes a relevant question properly to be resolved in this action.

## III. STANDING

The defendant's motion additionally challenges USA's standing to assert a claim under either the Sherman Act or the Robinson-Patman Act. This court finds that the complaint sufficiently demonstrates USA's standing to institute a cause of action under both of these statutes.

### A. *Sherman Act Claims*

A fair reading of USA's complaint and an application of the general antitrust stand-

ing guidelines enumerated in the recent *Associated General* decision compel the conclusion that the defendant's motion to dismiss the Sherman Act claims for lack of standing should be denied. In *Associated General,* the Supreme Court upheld the dismissal of the plaintiff-union's antitrust claim against the defendant, a multi-employer bargaining association that allegedly coerced certain third parties to enter into business relationships with nonunion firms. In so holding, the Court emphasized a variety of considerations pertinent to its conclusion that the union lacked standing to assert a claim for treble damages under Section 4 of the Clayton Act. Specifically, the Court examined the following factors:

(1) the causal connection between the antitrust violation and the plaintiff's alleged injury;

(2) whether the defendant intended to cause the harm;

(3) the nature of the plaintiff's alleged injury—whether the plaintiff was either a consumer or a competitor in the market in which trade was restrained;

(4) the directness or indirectness of the asserted injury—whether there exists a more directly injured identifiable class of persons whose self-interest would motivate them to vindicate the public interest in antitrust enforcement; and

(5) whether the damages claimed are speculative or involve the potential for duplicative recovery and complex apportionment.

*Id.* —— U.S. at —— - ——, 103 S.Ct. at 909–913, 74 L.Ed.2d at 737–743.

It also is important to note that the factual circumstances alleged in *Associated General* demonstrated a particularly compelling context for the denial of standing—the plaintiff union was neither a consumer nor a competitor in the market in which trade allegedly was restrained.

---

**2.** The issue of Arco's tax liability remains within the domain of the appropriate federal and state administrative bodies.

**1302**

■ Conversely, the present action involves, *inter alia*, an attempt by the plaintiff, a customer and retail-level competitor of defendant Arco,[3] to remedy the allegedly impaired ability of independent refiners, wholesalers and retailers to compete in the market. Moreover, USA asserts that Arco intended to, and in fact did, cause the resulting injury. This court additionally remains unpersuaded by Arco's contention that the plaintiffs are claiming a remote injury and that the coerced Arco-branded dealers and distributors constitute an identifiable class of "directly injured victims" with an economic incentive to sue. In reality, the allegations in the complaint suggest that Arco-branded dealers and distributors may have participated voluntarily in the Arco conspiracy directly aimed at eliminating USA and other independents from the marketplace. Thus, in light of the aforementioned factors, this court concludes that USA's complaint sufficiently satisfies the antitrust standing guidelines enumerated in the *Associated General* decision and, therefore, that USA properly asserts a Sherman Act claim for relief.

■ Arco additionally challenges USA's standing to assert various other types of conduct allegedly pursued in furtherance of the price-fixing conspiracy. Specifically, Arco focuses on claims relating to:

(1) Arco's "conditioning" or "tying" the sale of its low-priced Alaskan crude oil to certain independent refiners' purchases of high-priced Indonesian crude oil;

(2) "processing agreements," among Arco and certain independent refiners, which allegedly deprive independent marketers of a normal and essential source of supply;

(3) Arco's open-market purchases of crude oil at high, spot-market prices,

employed to drive up the prices of crude oil and wholesale gasoline and deprive independents of a source of supply; and

(4) Arco's refusal to sell gasoline to certain independent marketers.

Arco essentially contends that the plaintiff fails to demonstrate antitrust standing due to the absence of any allegations suggesting that USA has been injured by these practices.

In response, USA stresses that these acts do not constitute separate antitrust violations for which standing is required but, instead, merely demonstrate acts in furtherance of the alleged conspiracy.[1] Although this court is sympathetic with USA's desire to present evidence relevant to the general purpose and character of Arco's overall scheme, the complaint still must establish, at a threshold level, the manner in which these allegations relate to the harm that this plaintiff currently seeks to remedy.

Even if the present complaint is construed in the light most favorable to the plaintiff, the allegations pertaining to the "tying sales" and "processing agreements" unquestionably fail to demonstrate either the adverse impact of these practices on USA or the manner in which such practices relate to or facilitate Arco's overall price-fixing conspiracy. Thus, this court orders stricken all references in the complaint to the "conditioning" or "tying" sales and the "processing agreements."

### B. *Robinson-Patman Act Claims*

■ Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, provides, in pertinent part:

It shall be unlawful for any person engaged in commerce ... either directly or

---

**3.** The complaint alleges that "Plaintiff and its USA stations compete directly with Arco and Arco-branded stations at many locations in and beyond California. Plaintiff is also a purchaser of refined petroleum products from Arco."

**4.** USA refers to *American Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S.Ct. 1125, 1138, 90

L.Ed. 1575 (1946), and *United Mine Workers v. Pennington*, 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965), in support of the proposition that acts that cannot serve as an independent basis of recovery can, nonetheless, constitute probative evidence pertaining to other issues.

indirectly, to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be to substantially lessen competition ....

15 U.S.C. § 13(a) (1976).

This Act is designed to eliminate two types of competitive injury: "primary-line" injury, that is, injury occurring at the defendant-seller's level of competition (for example, injury resulting from adverse effects experienced by a horizontal competitor who seeks to sell to a favored customer), and "secondary-line" injury, the injury to the competition existing among the *customers* of the defendant-seller. In the present case, the allegations in Count III of the complaint establish USA's standing to assert both primary and secondary-line price discrimination in violation of the Robinson-Patman Act.

■ USA's primary-line price discrimination claim focuses on Arco's alleged "geographic price discrimination," whereby Arco sells gasoline and other refined petroleum products to its branded dealers and distributors at different prices, depending upon the locations of the retail service stations through which the product is sold.[5] In light of both USA's asserted status as a retail-level competitor of Arco and Arco's control over the prices that its dealers and distributors charge, USA has standing to challenge this primary-line geographic price discrimination.

In a factually analogous case, *Gas-A-Car, Inc. v. American Petrofina, Inc.*, 484 F.2d 1102 (10th Cir.1973), the Tenth Circuit refused to dismiss a primary-line Robinson-Patman Act claim for lack of standing. In so holding, that court rejected the defendant's assertion that the primary-line claim failed because the defendants, several major oil companies that sell gasoline only at a wholesale level, did not compete with the plaintiffs, retail-level gasoline station operators. The court concluded: "It is implicit within the allegations that appellees-wholesalers are indirectly setting the price of gas at retail level. If from appellees' conduct it can be rationally inferred that they are in effect operating at retail level, then we have primary line competition between appellants and appellees." *Id.* at 1107.

As in *Gas-A-Car*, the present action involves a claim against a wholesaler indirectly operating at the retail level by exerting control over the retail prices charged by its branded dealers.[6] Moreover, the complaint suggests that Arco competes directly with USA at the retail level through Arco owned and operated stations.[7] Thus, the allegations in the complaint amply support USA's standing to assert a primary-line violation.

■ The complaint similarly demonstrates the propriety of USA's secondary-line claim. Construing the complaint in the light most favorable to the plaintiff, this court is convinced that USA has demonstrated its status as a *disfavored* Arco customer.[8] Thus, USA fits squarely within the class of persons possessing standing to challenge secondary-line price discrimina-

---

5. In oral argument, USA's counsel asserted that this "zone pricing" system was instituted in order to lower only the prices charged by those conspiring dealers located near a USA station.

6. Although the vertical conspiracy allegations demonstrating Arco's control over retail prices are not incorporated by reference in the Count III Robinson-Patman Act claim, such a technicality cannot support dismissing this claim in its entirety.

7. Arco claims that any competition it may engage in at the *retail* level is irrelevant in light of the fact that USA's Robinson-Patman claim does not allege violations at this retail level, *i.e.,* there is no suggestion that Arco engaged in discrimi-

natory pricing to retail customers. In reality, however, a liberal reading of the complaint suggests, and USA counsel's oral argument further clarifies, that the essence of this primary-line claim focuses on Arco's efforts to decrease its wholesale prices to branded dealers located near USA stations, thereby enabling or coercing these dealers to set low retail prices.

8. The complaint specifically alleges that "Arco has extended prices to its branded distributors which are more favorable than those extended to independent or unbranded wholesale customers, such as plaintiff."

tion in violation of the Robinson-Patman Act.

## IV. FAILURE TO STATE A CLAIM

Arco's motion seeks to dismiss Counts I and II of the plaintiff's complaint as failing to state a claim under either Section 1 or Section 2 of the Sherman Act. This court agrees with the defendant's contention that Count II does not properly state a claim for relief under the Sherman Act's Section 2, but additionally finds that Count I amply states a cause of action within the purview of Section 1.

### A. *Count II—Attempt to Monopolize*

 It is well settled that a *prima facie* case of attempted monopolization in violation of Section 2 of the Sherman Act requires the allegation and proof of (1) specific intent to control prices or destroy competition in the relevant market, (2) predatory or anticompetitive conduct directed to accomplishing the unlawful conduct, and (3) a "dangerous probability of success." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 544 (9th Cir.1983); *Janich Brothers, Inc. v. American Distilling Co.*, 570 F.2d 848, 853 (9th Cir.1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). In the present case, the plaintiff's complaint, on its face, affirmatively alleges facts that indicate that no "dangerous probability of success" exists. USA specifically asserts that the end result of Arco's conduct will be the destruction of the independent segment of the industry, leaving a market controlled by the major oil companies. Thus, there is absolutely no indication of a dangerous probability of *Arco* successfully monopolizing the market.

 Although USA attaches great significance to the allegation in the complaint that the resulting control of the market will be acquired by the majors *and* "by Arco in particular," this phrase, alone, cannot satisfy the requisite allegation of a dangerous probability of success. Moreover, the complaint fails to indicate any facts that support the notion that Arco, itself, will achieve eventual control of the market. Although the allegations indicate a recent increase in Arco's market share since 1982, such that Arco accounted for fifteen percent (15%) of the gasoline sold in California as of January 1983, these figures do not establish that Arco eventually may control the *entire* relevant market. Clearly, even a company possessing a fifteen or twenty per cent market share cannot dominate a market admittedly including several other major integrated oil companies.

 Finally, this court is not persuaded by USA's attempt to avoid proving a "dangerous probability of success" by emphasizing, instead, the defendant's alleged predatory and anticompetitive conduct. This court is aware of the Ninth Circuit holding that, in certain circumstances, the trier of fact may infer a dangerous probability of success from evidence of conduct alone. *Foremost*, 703 F.2d at 544; *Janich Brothers*, 570 F.2d at 853. However, such an inference is impermissible where the complaint affirmatively alleges the very facts needed to rebut the inference. Thus, in light of the present complaint's undisputed allegation that the end result of Arco's misconduct would be a market controlled by all of the major oil companies, this court cannot permit an obviously unsupportable inference to overcome the defendant's motion to dismiss.

Given this court's finding that Count II must be dismissed for failure to allege a dangerous probability of success, I need not undertake to decide if the complaint adequately defines the relevant market that Arco allegedly sought to monopolize. Whether the relevant market constitutes all brands of gasoline or merely the discount sub-segment of the market, the complaint fails sufficiently to demonstrate the dangerous probability of Arco's successfully monopolizing *either* of these markets.

### B. *Count I—Restraint of Trade*

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form

of trust or otherwise, or conspiracy, in restraint of trade ..." 15 U.S.C. § 1. Count I of USA's complaint, detailing Arco's alleged resale price maintenance and vertical price-fixing scheme, properly states a claim for relief under this provision.

■ The allegations in the complaint describe a variety of practices employed by Arco as part of its conspiracy with Arco-branded dealers and distributors to charge artificially low retail gasoline prices. Specifically, USA claims that Arco maintained the branded dealers' participation in this conspiracy through a combination of both positive financial incentives—including "price allowances" and dealer "discounts" —and coercion. Such allegations clearly suggest conduct in violation of Section 1.

■ Arco seeks to dismiss Count I as failing to state a claim for three reasons. First, Arco argues that the complaint fails to allege *successful* coercion—that the dealers "succumbed" to Arco's coercive tactics. As Arco correctly notes, coercive conduct does not substantiate a claim alleging an unlawful vertical conspiracy unless the plaintiff can show that the coerced parties were deprived of their free choices in setting prices. *Hanson v. Shell Oil*, 541 F.2d 1352, 1357 fn. 3 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). Arco neglects to note, however, that proof of coercion is necessary to support a Section 1 claim only when there is no evidence of an express or implied agreement to fix prices vertically. *Knutson v. Daily Review, Inc.*, 383 F.Supp. 1346, 1355–1357 (N.D.Cal.1974), *aff'd in part, rev'd in part on other grounds*, 548 F.2d 795 (9th Cir.1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977).

Applying these principles to the present case, USA's complaint sufficiently states a Section 1 claim by alleging both Arco's coercion of its branded dealers and resale price-fixing "agreements" between Arco

and its dealers. The complaint specifically states:

Arco has solicited its dealers and distributors to participate or acquiesce in the conspiracy and has used threats, intimidation and coercion to secure compliance with its terms. Arco has, among other things, solicited dealers to lower their prices in conformity with Arco's marketing scheme *and has also coerced,* and attempted to coerce, them to do so .... (emphasis added)

Additional allegations further suggest that:

Arco and its co-conspirators have organized a resale price maintenance scheme, as a direct result of which competition that would otherwise exist among Arco-branded dealers *has been eliminated by agreement, and the retail price of Arco-branded gasoline has been fixed,* stabilized and maintained at artificially low and uncompetitive levels. (emphasis added).

The issue of whether Arco actually engaged in coercive and price-fixing tactics is a question of fact to be determined at trial. For the purposes of the present motion, however, this court finds that USA's Count I restraint of trade claim contains enough alleged facts to overcome Arco's motion to dismiss.

■ Arco's second argument stresses that its utilization of dealer "discounts," allegedly employed to facilitate Arco's control over the retail prices charged by its branded dealers and distributors, does not constitute conduct prohibited by Section 1. In support of this contention, Arco argues that such discounts merely lower the wholesale price of gasoline, leaving dealers and distributors free to set retail prices.

Once again, Arco misconstrues the broad import of USA's claims. As the Ninth Circuit noted in the *Hanson* decision, although some dealer assistance programs are permissible,[9] if the dealer assistance is condi-

---

9. In *Hanson,* 541 F.2d at 1356, the court approved a "dealer assistance" pricing program wherein Shell Oil Co. provided assistance to individual dealers that asked for it in order to

enable those dealers to meet existing competition without extreme financial sacrifice. Moreover, the court conclusively found that "the 'dealer assistance' program could not be con-

tioned upon a dealer's reducing his retail price or if it is initiated in order to force dealers to fix prices, a more serious examination of possible Section 1 violations is warranted. *Hanson,* 541 F.2d at 1356. Construing the present complaint in a liberal fashion, this court finds it to allege that the dealer discounts were instituted by Arco as an illegal means of controlling the retail gasoline prices. Thus, this court cannot conclude, based solely on the pleadings, that Arco's dealer assistance programs are legal under Section 1 of the Sherman Act.

■ Arco finally expresses its lament that proving the present vertical price-fixing conspiracy would entail dealer-by-dealer proof demonstrating that thousands of Arco dealers were deprived of their free choices in setting prices. This concern, however, is unwarranted. USA's counsel suggested in oral argument that USA expects to show, at trial, that dealers within its marketing territory did go along with the conspiracy. Moreover, this court is not convinced that the present price-fixing conspiracy must be analyzed and evaluated solely on a dealer-by-dealer basis.[10] Consequently, there appears to be no compelling reason to limit USA's opportunity to present its Section 1 claim.

## V. STATE LAW CLAIMS

Arco presents a variety of arguments in support of its request to dismiss the numerous state law claims contained in Counts IV through XI. This court is not persuaded by the majority of these arguments and concludes that the present complaint properly asserts several claims for relief stemming from Arco's alleged violations of various California statutes.

### A. *General State Law Claims*

■ At the outset, it is important to note that USA's state law claims are appropriately pleaded under the doctrine of pendent jurisdiction and this court is not ob-

liged to dismiss them in light of the decision to entertain the federal antitrust claims. *Cf., United Mine Workers v. Gibbs,* 383 U.S. 715, 716, 86 S.Ct. 1130, 1134, 16 L.Ed.2d 218 (1966) (requiring dismissal of state claims when federal claims are dismissed before trial).

■ This court additionally concludes that USA properly asserts claims for relief under both the Cartwright Act, Cal.Bus. & Prof.Code §§ 16700, *et seq.,* and the California Motor Vehicle Fuels Discrimination Statute, Cal.Bus. & Prof.Code § 21200. The provisions in these statutes parallel those contained in Section 1 of the Sherman Act and Section 2(a) of the Robinson-Patman Act, respectively. Consequently, this court's refusal to dismiss the Section 1 Sherman Act and the Robinson-Patman Act claims inevitably leads to the conclusion that USA properly states a claim for relief under these similarly phrased state statutes.

■ Arco's attempt to characterize the adjudication of USA's state law claims as a violation of the Commerce Clause also is rejected. Although the complaint describes predatory conduct that allegedly occurred in California "and elsewhere," USA has assured this court that it does not seek to extend California law to transactions occurring outside this state. Accordingly, the court cannot find any resulting interference with or burden on interstate commerce in contravention of the Commerce Clause.

### B. *Unfair Practices Act Claims*

■ The main thrust of the defendant's attempt to dismiss the remaining state law claims focuses on the counts alleging violations of the California Unfair Practices Act, Cal.Bus. & Prof.Code §§ 17000, *et seq.* (the "UPA"). Initially, Arco challenges USA's standing to assert a violation of the UPA. Arco refers to *Harris v. Capitol Records Distributing Corp.,* 64 Cal.2d 454, 50 Cal.

---

strued as an attempt by Shell to regulate its dealers' retail prices."

**10.** *United States v. General Motors,* 121 F.2d 376, 397 (7th Cir.1941), affirmed this notion in a slightly different context.

Rptr. 539, 413 P.2d 139 (1966), in support of its contention that USA, a retailer, lacks standing to challenge Arco's wholesale conduct. In that case, the court distinguished between injury to competition on the *same* level as the person allegedly engaged in price or locality discrimination, to which the UPA applies, and injury to *secondary* level competition among the purchasers from the alleged discriminator, to which the Act does not apply. The circumstances alleged in the present case, demonstrating Arco's status as a direct competitor of USA,[11] properly place this action within the category of cases for which standing exists. Thus, this court holds that USA has standing to pursue the UPA claims enumerated in Counts V through IX and XI of the complaint.

Arco specifically challenges the validity of USA's loss leader claim described in Count VI of the complaint. The complaint states that:

> Since at least the spring of 1982, Arco, through operating companies and service stations owned, operated or controlled by it, has used and sold certain grades of gasoline at less than cost and as a loss leader for other products and services in violation of Cal.Bus. & Prof.Code §§ 17044 and 17049.
>
> * * * * * *
>
> Such use and sale of certain grades of gasoline at less than cost have been and are being made with the purpose to induce, promote or encourage the purchase of other merchandise such as other grades of gasoline or other goods sold at Arco branded stations.

UPA § 17044 proscribes the sale of any article or product as a "loss leader." Additional language in UPA § 17030 broadly defines a loss leader as "any article or product sold at less than cost:

(a) Where the purpose is to induce, promote or encourage the purchase of other merchandise; or

(b) Where the effect is a tendency or capacity to mislead or deceive purchasers or prospective purchasers; or

(c) Where the effect is to divert trade from or otherwise injure competitors."

■ Although expressing no opinion as to USA's standing to assert a loss leader claim, this court nonetheless upholds Arco's request to strike Count VI due to the similarity between the conduct alleged in that count and the "below cost sales" described in Count V. As neither a customer victimized by the loss leader sales nor a competitor in the "other" product market, USA's sole basis for challenging the loss leader sales stems from the competitive injury it purportedly suffered as a result of the reduced prices in the loss leader market. Such a complaint, however, more appropriately falls within the purview of Cal.Bus. & Prof.Code §§ 17043 and 17049, the UPA provisions enumerated in Count V, which prohibit below cost sales. Thus, this court concludes that the Count VI loss leader claim should be dismissed as a repetitive claim for relief, which fails to allege any conduct or injury to USA beyond those facts alleged in support of the below cost claim.

■ Finally, Arco challenges the propriety of Count XI, wherein USA alleges unfair competition in violation of Cal.Bus. & Prof.Code §§ 17200, *et seq.* (former Civ. Code § 3369). These provisions proscribe "unfair competition," defined as "unlawful, unfair or fraudulent business practices." California courts have consistently interpreted such language in a broad fashion. Specifically, "unlawful business practices" have been held to include "anything that can properly be called a business practice and that at the same time is forbidden by law." *People v. McKale*, 25 Cal.3d 626, 632, 159 Cal.Rptr. 811, 602 P.2d 731 (1979), quoting *Barquis v. Merchants Collection Assn.*, 7 Cal.3d 94, 113, 101 Cal.Rptr. 745,

---

**11.** Recall the discussion in Section III B above, concluding that USA possesses standing to assert a primary-line Robinson-Patman Act price discrimination claim. Similarly, Arco's control of its branded and owned and operated retail stations establishes the retail-level competition between USA and Arco necessary to support a UPA claim.

496 P.2d 817 (1972). In the present case, in light of the unlawful practices adequately alleged in Counts I through X, this court rejects the defendant's motion to dismiss the unfair competition claim.

It should be noted, however, that if USA fails to prove the unlawful practices alleged in the complaint, this court will not be receptive to an attempt to claim a violation of §§ 17200, *et seq.*, based upon Arco's "unfair" business practices. This court is reluctant to entertain such a cause of action in the context of the present case, where there is no suggestion that the public has been deceived by Arco's asserted misconduct. As the California Supreme Court noted in *People v. McKale*, 25 Cal.3d at 635, 159 Cal.Rptr. 811, 62 P.2d 731: "What constitutes 'unfair competition' or 'unfair or fraudulent business practice' under any set of circumstances is a question of fact ... the essential test being whether the public is likely to be deceived ...." (Citation omitted.) Consequently, the present decision to allow USA to pursue its Count XI unfair competition claim stems solely from this court's conclusion that USA does adequately allege "unlawful" business practices.

## VI. CONCLUSION

For the aforementioned reasons, this court holds that the allegations pertaining to the Sherman Act Section 2 claim (Count II), the "tying" sales and "processing agreements" (described in Count I) and the loss leader claim (Count VI) will be stricken from the complaint. The plaintiff shall have thirty (30) days to amend the complaint, if so desired. The defendant's motion to dismiss, in all other respects, is denied.