Filed 5/18/15  Kitrosser v. NuVasive, Inc. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BRENDA F. KITROSSER, | D064946 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2009-00099700 consolidated with 37-2010-00099400-CU-PO-CTL) |
| NuVasive, INC., | |
| Defendant and Appellant. | |

APPEAL from an amended judgment and a posttrial order of the Superior Court of San Diego County, Judith F. Hayes, Judge.  Affirmed.

Brown Wegner McNamara, Matthew K. Wegner, Valerie L. McNamara and Lily Y. Li for Defendant and Appellant.

Law Offices of Robert Vaage, Robert F. Vaage; Niddrie, Fish & Addams and Michael H. Fish for Plaintiff and Respondent.

NuVasive, Inc. (NuVasive) develops and markets medical devices used primarily in spine surgery.  William R. Taylor, M.D., is a clinical professor of neurosurgery, vice-

chairman of the neurosurgery department and director of minimally invasive spine surgery at the University of California in San Diego (UCSD). In September 2008, Taylor performed spine surgery on Brenda Kitrosser, using a NuVasive device known as NeuroVision. The surgery did not go well for Kitrosser, and she sued NuVasive, Taylor and UCSD. The case went to trial against NuVasive only, and the jury awarded Kitrosser significant compensatory damages on her claim that NuVasive conspired with Taylor to make false representations to patients, including Kitrosser, concerning the NeuroVision device that convinced Kitrosser to undergo a procedure that entailed the use of this device.

On appeal, NuVasive contends the court erred by denying its motion for judgment notwithstanding the verdict (JNOV), because the special verdict returned by the jury failed to decide a material issue of fact supporting Kitrosser's claim for intentional misrepresentation on a theory of conspiracy, thereby rendering the special verdict fatally defective. NuVasive also contends the evidence does not support the jury's verdict, and the court prejudicially erred by admitting certain evidence. We disagree and affirm.

I.

FACTUAL AND PROCEDURAL BACKGROUND[1]

A.    *NuVasive and the NeuroVision Device*

Included among NuVasive's spine surgery products is the NeuroVision device, which is designed to sense the presence of nerve tissue during surgery, including when a surgeon accesses the spine or places instrumentation in the spinal vertebrae. NuVasive markets the NeuroVision device as, among other things, an aid to a specific type of spine surgery where the surgeon accesses the spine from the patient's side, rather than from the patient's back or front as is traditionally done. NuVasive has copyrighted and trademarked the moniker "XLIF" (an acronym for "eXtreme Lateral Interbody Fusion") for this type of surgery. A recognized risk of this procedure is injury to the nerves of the psoas muscle, which the surgeon must pass through in order to access the spine from the patient's side. NuVasive claims the NeuroVision device can assist the surgeon in avoiding injury to these nerves during surgery. Tens of thousands of patients have undergone surgery using the NeuroVision device.

NuVasive created two pamphlets about the NeuroVision device that NuVasive encouraged surgeons to use in their consultations with patients (XLIF pamphlets).[2] One

---

[1]    "As required by the rules of appellate procedure, we state the facts in the light most favorable to the judgment." (*Orthopedic Systems, Inc. v. Schlein* (2011) 202 Cal.App.4th 529, 532, fn. 1.)

[2]    The XLIF pamphlets were distributed by a trade organization called the Society for Lateral Access Surgery (SOLAS), which NuVasive created and funded specifically to promote NuVasive's research and products associated with the XLIF technique.

pamphlet promises that the NeuroVision device "provides real-time, precise and reliable feedback to ensure your nerve safety." The pamphlet further explains, "With the minimally invasive XLIF® approach, and the safety afforded by this nerve monitoring system, you can experience a faster recovery and a quicker return to your normal lifestyle." A second pamphlet states, "Finally, you will be prepared for intraoperative nerve monitoring — this will ensure safe approach to the spine." The NuVasive marketing employee responsible for the above-quoted language — and whom NuVasive designated as the person most knowledgeable about the SOLAS patient education pamphlets — used the word "ensure" to mean "[t]o make sure."[3] Despite that testimony, the employee was unsure whether the NeuroVision device could actually "ensure . . . nerve safety."

More importantly, despite these representations, NuVasive knew the NeuroVision device could not guarantee nerve safety. For example, NuVasive had identified 28 ways in which the NeuroVision device could return a "false negative" — i.e., by failing to raise an alarm when it should have. NuVasive had received dozens of reports of false negative readings on NeuroVision devices. Such false negative readings can lead to permanent

NuVasive acknowledges that the XLIF pamphlets "were published by NuVasive and designed to be provided to patients by surgeons"; and to order the XLIF pamphlets, the SOLAS materials provide a reference to "www.nuvasive.com" and encourage the reader to "contact your NuVasive® Sales Consultant."

[3] The jury was instructed: " 'Ensure' " has been defined variously as: (1) "to make . . . sure"; (2) "to make safe, protect"; (3) "to make certain of or sure of; insure, or to make sure, certain, or safe; guarantee."

4

nerve damage. NuVasive was aware of at least one instance where a false negative reading occurred and injury resulted. At trial, NuVasive's expert in the product development of medical devices agreed that the "NeuroVision device cannot eliminate the risk of false negatives."

B.     *NuVasive and Taylor's "Productive Cooperation"*[4]

Beginning in 2003, NuVasive entered into a series of consulting and other business arrangements with Taylor. Taylor helped NuVasive develop and test new devices; educated surgeons on the XLIF procedure and the use of NuVasive products, including the NeuroVision device; spoke at conferences, to the media, and to investors about NuVasive and its devices; presented to the NuVasive board of directors; acted as head of NuVasive's bone bank; appeared as a coinventor on a NuVasive patent application; advised NuVasive's sales and marketing staff; and otherwise promoted NuVasive's products in the medical community. NuVasive also consulted Taylor regarding language in its patient pamphlets — including the XLIF pamphlets.

Taylor's work was key to NuVasive's success. In its form 10-K filing with the Securities and Exchange Commission, in early 2008 NuVasive recognized that

---

[4]     "[P]roductive cooperation" is a phrase NuVasive uses to describe relationships between physicians and medical device companies.

NuVasive describes the "learned intermediary doctrine" as a policy that insulates medical device manufacturers from liability for physicians' errors. NuVasive discusses the learned intermediary doctrine in various places in its opening brief, including citing a California Supreme Court opinion and attaching unpublished federal opinions that deal with the issue. Understandably, Kitrosser responded in her brief. In its reply brief, however, NuVasive assures us that it does *not* contend that the learned intermediary doctrine applies in this case. Thus, we express no opinion on the topic.

5

"recommendations and support of our products by influential surgeons are essential for market acceptance and adoption [of NuVasive products]." For his efforts, Taylor received stock, stock options, consulting fees, per diem payments, royalties, and other compensation. By 2008, Taylor was receiving in excess of $220,000 per year in payments from NuVasive, including almost $135,000 per year in royalties.[5] In or around September 2008, Taylor also held approximately $472,000 worth of NuVasive stock options.

UCSD requires its employees who participate in clinical trials to submit a disclosure form in order to identify potential conflicts of interest. The form, denominated the 700-U, requires the employee to state under penalty of perjury whether the employee is a consultant to the entity sponsoring the trial, whether the employee receives any income from that entity and whether the employee has an ownership interest in the entity.

In 2006, NuVasive selected Taylor to be the principal investigator on a clinical trial involving the NeuroVision device; and on his 700-U form, Taylor identified the prior 12 months' consulting income from NuVasive to be in the range of $10,001 to $100,000. The UCSD committee tasked with reviewing 700-U forms approved Taylor's participation in the trial *on the express conditions* that Taylor neither receive compensation from NuVasive nor speak at NuVasive-sponsored events during the trial.

---

5    This $220,000 was in addition to — and an additional 40 percent of — what Taylor made at UCSD.

6

The clinical trial did not go forward, and Taylor continued receiving compensation from NuVasive[6] — which totaled more than $144,000 in 2006.

Two years later, in 2008, NuVasive selected Taylor to be the principal investigator in another clinical trial related to the NeuroVision device. Taylor filled out the required 700-U form, but this time he did not disclose either his consulting relationship with NuVasive or the income he had received from NuVasive. Taylor's 700-U form did not lead to any further inquiry from UCSD, and this time UCSD allowed Taylor to be the principal investigator without any conditions limiting his compensation from or contact with NuVasive. Taylor's representations were false. At the time, as previously noted, Taylor was receiving approximately $220,000 per year in compensation from NuVasive.

On two additional occasions, NuVasive selected Taylor to be the principal investigator for other clinical trials. Taylor made the same false representations on his 700-U forms for those trials as well.

NuVasive also had its own conflict of interest forms for its investigators in its clinical trials. These forms are required by the Food and Drug Administration (FDA) and must be made available to the FDA upon request. On two such forms, Taylor falsely claimed to have received no compensation from NuVasive and to have no equity interest in NuVasive. According to NuVasive's executive vice president and general counsel, NuVasive was responsible for checking the accuracy of Taylor's disclosures.

---

6    Taylor could not remember why this clinical trial did not proceed.

7

When Taylor's false statements on UCSD's 700-U forms came to light during this litigation, Kitrosser's counsel reported Taylor to the Fair Political Practices Commission (FPPC), which enforces compliance with the disclosure obligations in the 700-U forms. Taylor and the FPPC entered into a stipulation, decision and order (FPPC Decision); Taylor had violated California law by making false statements on his 700-U forms, and he was required to pay a $12,000 fine. As part of the exhibit in support of the stipulation, one of the expressly listed aggravating factors was that NuVasive "benefited by being able to utilize research conducted under the auspices of the University of California in the development and promotion of their own medical research projects and products." Even after NuVasive became aware of Taylor's false statements, the FPPC's findings and the fine, NuVasive did nothing to reprimand Taylor or otherwise alter its relationship with Taylor.

C.    *Kitrosser and the Surgery*

Kitrosser had undergone spine surgery (a discectomy) in 1993, and although it was successful, she reinjured her back in 1997, requiring her to retire from teaching in her 50's. For the next 10 years, she experienced various levels of pain, during which time she consulted a number of back surgeons with whom she discussed the possibility of surgery. She consistently avoided further surgery, however, because she "was scared to death of any kind of . . . open back surgery." In particular, Kitrosser did not want her spine to be operated on from the back, and she did not want any screws or other instrumentation placed in her spine.

8

In 2007, at a time Kitrosser was suffering from chronic back, leg, neck and arm pain that affected her mobility, one of her physicians referred her to Taylor for possible spine surgery.  According to Taylor's notes, at this first visit in August 2007, Kistrosser's medical condition included scoliosis and lumbar stenosis with pain at an " '8 out of 10.' " Kitrosser's condition worsened, and she had follow-up visits with Taylor in November 2007 and February 2008 and two in March 2008.

Kitrosser remembered the March 21, 2008 visit very well, because Taylor explained the benefits of XLIF surgery and its side approach to the spine.   Kitrosser understood the surgery would be a "minimally invasive procedure" in which "there would be no cutting of my back, which is what I wanted to hear, and no instrumentation.  No screws put in my back."  Taylor also promoted "a new kind of device with which he could monitor my nerves, nerve safety for the entirety of the procedure.  [¶]  He said it would remove any risk of nerve injury.  It would be safe."  When asked "exactly" what Taylor said, Kitrosser testified, "he guaranteed the safety of my nerves.  He was using a device now that's a monitor that guarantees the safety of my nerves."[7]  This procedure — in particular the monitoring and safety of the nerves — was "[c]ompletely" different from the back surgery Kitrosser had undergone more than 10 years earlier.  Taylor's written

---

[7]    Kitrosser testified that Taylor had told her that death, bleeding or infection could result from the surgery.   At trial, Taylor denied telling Kitrosser that the surgery would be successful, that the NeuroVision device would guarantee her nerves would be safe and that he would not use screws or other instrumentation in the surgery.  He did acknowledge, however, that he may have told Kitrosser the NeuroVision device would "help ensure" the safety of her nerves.

9

report recommended a three-level spinal fusion "at L2-3, 3-4, and 4-5 XLIF without posterior instrumentation."

Following these consultations, as of March 2008 Kitrosser was still unsure whether to proceed with the surgery. Desiring more information, Kitrosser called Taylor's office several times. Eventually, with Taylor's approval, his clinical coordinator — his assistant responsible for patient contact and scheduling surgeries, tests and appointments — sent Kitrosser the two NuVasive XLIF pamphlets.

A NuVasive salesperson had told Taylor that the XLIF pamphlets could be used to provide patients with more information about the XLIF procedure and NuVasive's nerve monitoring devices. Indeed, NuVasive and SOLAS (the NuVasive-sponsored professional society) encouraged surgeons to use the XLIF pamphlets by, among other things, customizing the XLIF pamphlets with the surgeon's name and contact information. The XLIF pamphlets Taylor's office sent Kitrosser were customized for Taylor, who paid for the opportunity to have his name and contact information on the XLIF pamphlets he distributed.

The XLIF pamphlets confirmed exactly what Taylor had told Kitrosser during their consultations — including specifically that the NeuroVision device would "ensure nerve safety" and "ensure [a] safe approach to the spine."[8] Protecting her nerves from damage was "very important" to Kitrosser. Following her receipt and review of the XLIF

_____

[8]     In fact, given the information communicated in the XLIF pamphlets with Taylor's name and contact information, Kitrosser thought that Taylor had written the pamphlets.

10

pamphlets, Kitrosser decided to undergo the surgery, testifying that she would not have agreed to surgery if she had known the NeuroVision device could give false information or otherwise create a risk of nerve injury.

During the September 2008 surgery, Taylor used the XLIF technique with the NeuroVision device to complete the three-level spinal fusion. More specifically, after accessing the spine and determining the extent of Kitrosser's disc degeneration, Taylor fused the affected vertebrae using screws guided by the NeuroVision device. The NeuroVision device did not indicate any problems, including the presence of nerves.

Following surgery, Kitrosser's condition worsened. Her pain dramatically increased, and she had greater difficulty walking and performing daily activities than before the procedure. Later tests revealed that one of the screws Taylor placed in Kitrosser's spine had breached her spinal canal, impinging on a nerve root. Thus, according to one of Kitrosser's experts, by failing to raise an alarm, the NeuroVision device gave a false negative while (and after) placing the screws.

D.    *The Trial Court Proceedings*

In October 2009, as a result of the surgery Kitrosser filed suit against Taylor, his physician's assistant, and the Regents of the University of California, alleging a number of claims in seven causes of action. Eleven months later, Kitrosser filed a separate lawsuit against NuVasive, alleging a number of claims in nine causes of action related to the surgery. In early 2011, the court consolidated the two lawsuits. Shortly before trial,

11

Kitrosser settled her claims against Taylor and the Regents of the University of California for $1.75 million.[9]

During the February-April 2013 time period, the court presided over a jury trial at which Kitrosser proceeded against NuVasive on causes of action for intentional misrepresentation, negligence per se, and breach of express warranty. Kitrosser pursued two separate claims of intentional misrepresentation against NuVasive: (1) liability for its intentional misrepresentations to Kitrosser about the NeuroVision device in the XLIF pamphlets; and (2) liability, on a theory of civil conspiracy, for Taylor's intentional misrepresentations to Kitrosser. Kitrosser called numerous current and former NuVasive employees to testify regarding the NeuroVision device, the preparation of NuVasive's XLIF pamphlets, and NuVasive's relationship with Taylor. Taylor testified regarding his work for NuVasive, the 700-U forms he submitted to UCSD, the subsequent FPPC Decision, and his treatment of and surgery on Kitrosser. Kitrosser testified regarding her consultations with Taylor, her review of the pamphlets, and her physical condition before and after Taylor's surgery. Numerous other lay and expert witnesses testified. NuVasive's principal defenses were: the XLIF pamphlets were not false or misleading; Taylor did not make false or misleading statements to Kitrosser; if Taylor did make such statements, NuVasive did not agree or intend for him to do so; and Kitrosser's injuries were overstated.

---

[9]     The parties do not tell us what happened to Taylor's physician's assistant.

12

After three weeks of deliberations, in a special verdict, the jury found in favor of Kitrosser on her claim of intentional misrepresentation on the theory of conspiracy. The jury found that Taylor intentionally or recklessly made false and misleading statements, Kitrosser relied on those statements, Taylor's statements were a substantial factor in causing Kitrosser's harm, and NuVasive agreed and intended that Taylor made such statements. On Kitrosser's claim for intentional misrepresentation based on NuVasive's own statements, the jury found that, although NuVasive intentionally or recklessly made false and misleading statements and that Kitrosser relied on those statements, NuVasive's statements were not a substantial factor in causing Kitrosser's injuries. Similarly, on Kitrosser's cause of action for breach of express warranty, the jury found although NuVasive had breached an express warranty, the breach was not a substantial factor in causing Kitrosser's injuries. Finally, the jury was unable to reach a verdict on Kitrosser's cause of action for negligence per se.[10] The jury awarded Kitrosser approximately $3.1 million in damages, which the court later reduced to approximately $2.6 million based on various offsets. NuVasive filed motions for a new trial and for JNOV, which the court denied in early October 2013. As relevant to the issues on appeal, the basis of NuVasive's motion for JNOV was that because the jury did not expressly find that Taylor made the misrepresentation that was the object of the conspiracy — namely, false

---

[10]    Kitrosser later dismissed without prejudice the sixth cause of action for negligence per se.

13

representations about the NeuroVision device — the special verdict does not contain an essential element of Kitrosser's conspiracy claim.

The court filed an amended judgment on October 18, 2013, and NuVasive timely appealed.

II.

DISCUSSION

On appeal, NuVasive presents three independent arguments: (1) the record does not contain substantial evidence to support the jury's finding of conspiracy; (2) the special verdict returned by the jury is fatally defective, because it omits a factual finding necessary to support Kitrosser's claim of intentional misrepresentation by conspiracy; and (3) the trial court erred in admitting evidence relating to Taylor's false statements on his 700-U forms and to the resulting FPPC Decision.

A.    *Substantial Evidence Supports the Finding of Conspiracy*

NuVasive contends that the record lacks substantial evidence to support the jury's finding of a conspiracy. We disagree.

1.    *Law*

In *Applied Equipment Corp. v. Litton Saudi Arabia Ltd*. (1994) 7 Cal.4th 503 (*Applied Equipment*), our Supreme Court summarized:

> "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.] By participation in a civil conspiracy, a coconspirator effectively adopts as her or her own the torts of other coconspirators within the ambit of the conspiracy. [Citation.] In this way,

14

a coconspirator incurs tort liability co-equal with the immediate tortfeasors." (*Id.* at pp. 510-511.)

"Hence, where the complaint charges a conspiracy and the commission of a wrongful act, the only significance of the conspiracy charge is that each member may be held responsible as a joint tortfeasor, regardless of whether that member directly participated in the act." (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 45, p. 111 [and collected cases]; *id.* (2014 Supp.) § 45, p. 18.)

To prove a claim for civil conspiracy, a plaintiff must "provide substantial evidence of three elements: (1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." (*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581 (*Kidron*); see *Applied Equipment*, *supra*, 7 Cal.4th at p. 511.) "Accordingly, '[t]he basis of a civil conspiracy is the formation of a group of two or more persons who have agreed to a common plan or design to commit a tortious act.' [Citations.] . . . The conspiring defendants must also have actual knowledge that a tort is planned and concur in the tortious scheme with knowledge of its unlawful purpose." (*Kidron*, at p. 1582; see *Harris v. Capitol Records Distributing Corp.* (1966) 64 Cal.2d 454, 462 [to be a conspirator, "one must share a common purpose with another"].) "Unless there is such a meeting of the minds, ' "the independent acts of two or more wrongdoers do not amount to a conspiracy." ' " (*Choate v. County of Orange* (2000) 86 Cal.App.4th 312, 333.)

Because direct evidence of a conspiracy is often lacking, "the requisite concurrence and knowledge ' " 'may be inferred from the nature of the acts done, the

relation of the parties, the interests of the alleged conspirators, and other circumstances.' " ' " (*Wyatt v. Union Mortgage Co*. (1979) 24 Cal.3d 773, 785; see *Holder v. Home Sav. & Loan Assn.* (1968) 267 Cal.App.2d 91, 108 (*Holder*); *Biggs v. Tourtas* (1949) 92 Cal.App.2d 316, 322 [since "it is next to impossible to secure direct evidence of a conspiracy, . . . the proof must usually be inferential and circumstantial"].) For this reason, "[t]acit consent as well as express approval will suffice to hold a person liable as a coconspirator." (*Wyatt*, at p. 785.)

    2.    *Standard of Review*

Our consideration whether the verdict is supported by substantial evidence is governed by the well-established standard of review applicable to any claim that a judgment or finding is not supported by the evidence in the record:

> "In reviewing the evidence on such an appeal, all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary, but often overlooked, principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (*Crawford v. Southern Pac. Co.* (1935) 3 Cal.2d 427, 429.)

We "look to the entire record [of the appeal]"; and if there is such substantial evidence, "it is of no consequence that the [jury] believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873, 874, italics omitted (*Bowers*); see *Johnstone v. Morris* (1930) 210 Cal. 580, 590 ["The jury may infer the conspiracy from all the

16

circumstances, and if the inference is a reasonable one, it will not be disturbed on appeal."]; *Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 872 (*Toyota Motor Sales*) ["Where conflicting inferences may reasonably be drawn, the determination of the [jury] will be accepted on appeal even though a contrary determination would likewise be upheld."].)

Quoting from *Peterson v. Cruickshank* (1956) 144 Cal.App.2d 148, NuVasive suggests that, with regard to evidence of a conspiracy, " 'if there be two inferences equally reasonable and equally susceptible of being drawn from the proved facts, the one favoring fair dealing and the other favoring corrupt practice, *it is the express duty of the court or jury to draw the inference favorable to fair dealing*.' " (*Id.* at p. 164.) However, this is a standard applied by the trier of fact in the first instance, not by the appellate court on review. (See *id.* at pp. 165-168; *Toyota Motor Sales*, *supra*, 220 Cal.App.3d at p. 872.) On appeal, "the test is *not* the presence or absence of a substantial conflict in the evidence. Rather, it is simply whether there is substantial evidence in favor of the respondent. If this 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.) The fact that the record may contain substantial evidence in support of an appellant's claims is irrelevant to our role, which is limited to determination of the sufficiency of the evidence *in support of the judgment actually made*. (*Ibid*.) NuVasive's contention that "a reasonable alternative inference exists" — namely, one that supports fair dealing — is, therefore, irrelevant.

17

In determining the sufficiency of the evidence, we "may not weigh the evidence or consider the credibility of witnesses.  Instead, the evidence most favorable to [the respondent] must be accepted as true and conflicting evidence must be disregarded." (*Campbell v. General Motors Corp*. (1982) 32 Cal.3d 112, 118.)  The testimony of a single witness, including that of a party, may be sufficient (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614; Evid. Code, § 411); whereas even uncontradicted evidence in favor of an appellant does not establish the fact for which the evidence was submitted (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890).  "[T]he focus is on the quality, not the quantity of the evidence."  (*Toyota Motor Sales*, *supra*, 220 Cal.App.3d at p. 871.)

3.      *Analysis*

In arguing that the record lacks substantial evidence of a conspiracy, NuVasive's principal contention is that, because "there was no basis for liability arising from NuVasive's direct conduct," there necessarily was insufficient evidence of a conspiracy between NuVasive and Taylor to misrepresent the NeuroVision device in order to induce Kitrosser to consent to the XLIF procedure.[11]  To this end, NuVasive relies on evidence and inferences that suggest its association with Taylor was a productive business

---

[11]      Even though the jury did not find NuVasive liable to Kitrosser for fraud, the jury *did* find that NuVasive made false representations of material fact to Kitrosser; that NuVasive knew the representations were false (or made the representations recklessly and without regard for the truth); that NuVasive intended Kitrosser to rely on the misrepresentations; and that Kitrosser reasonably relied on NuVasive's misrepresentations.

18

relationship between a medical device manufacturer (that deals with doctors) and a physician who uses the company's products (and deals with patients). However, that is not our focus; rather, we are concerned with whether there is evidence — and inferences from evidence — of a conspiracy, not whether there may be evidence to support a different relationship. (*Bowers*, *supra*, 150 Cal.App.3d at p. 874 ; *Toyota Motor Sales*, *supra*, 220 Cal.App.3d at p. 871.) As we explain, we are satisfied that the record contains substantial evidence to support the jury's verdict on conspiracy.

To begin, Kitrosser presented evidence that the association between NuVasive and Taylor was not, as suggested by NuVasive, an ordinary business relationship between a medical device manufacturer and a physician who uses the company's devices. Taylor was a well-compensated consultant to and advocate for NuVasive; he benefited significantly from NuVasive's successes, including royalties from NuVasive's sales of its NeuroVision device and other products. NuVasive's president of global products and services considered Taylor "key to making NuVasive great" — for which Taylor was well-compensated. For example, in the two years preceding Kitrosser's surgery, 2006-2007, NuVasive paid Taylor more than $341,000 ($90,000 in fees, $217,910 in royalties and $33,691 in "other payments"); in the year of Kitrosser's surgery, 2008, NuVasive paid Taylor more than $220,000 ($40,000 in fees, $134,577 in royalties and $46,000 in "other payments"); and over the years, NuVasive gave Taylor stock options for 25,000 shares of the company, which at the time of Kitrosser's surgery had a value of

19

approximately $472,000.[12] Taylor acknowledged that the more products NuVasive sold (which were subject to his royalty agreements), the more he benefited financially. In addition, NuVasive sponsored clinical studies to convince surgeons to use NuVasive products and techniques — studies for which NuVasive hired (and compensated) Taylor as the principal investigator. Also, Taylor worked with the NuVasive sales group, providing direct input as to how to sell NuVasive products to surgeons. Taylor was on the board of directors and chaired the surgeon training committee of SOLAS, the trade organization that NuVasive created and funded specifically to promote NuVasive's research and products associated with the XLIF technique. NuVasive prepared specific points for Taylor to discuss with potential underwriters; and at NuVasive's request, Taylor personally met with NuVasive's financial analysts to answer their questions about NuVasive's products.

In 2006, as part of UCSD's formal policy requiring applicant disclosures and university approval for UCSD doctors who want to serve as principal investigators in clinical studies, UCSD warned Taylor he could not "engage in any recompensed activity with [NuVasive] during the course of [a NuVasive] study" for which he was to be the principal investigator. NuVasive and Taylor did not proceed with this study. In 2008, during the same process for a NuVasive study regarding use of the NeuroVision device

---

[12]    In his deposition, the video of which was played for the jury, Taylor could not recall *any* services he provided in exchange for the annual payments of at least $40,000 in fees. From this, the jury could infer NuVasive was paying Taylor to persuade patients to use the XLIF technique and, accordingly, the NeuroVision device.

during the XLIF procedure, Taylor falsely answered the required financial disclosure form by failing to disclose his consulting relationship with and considerable income and travel expenses from NuVasive. Likewise, Taylor failed to provide accurate information about his income from and ownership interest in NuVasive on the financial disclosure form required by NuVasive for all potential clinical investigators. Accordingly, this study proceeded. Taylor failed to provide the same information on disclosure forms for clinical investigations on behalf of NuVasive in March and June of 2009. Once NuVasive learned of Taylor's false financial disclosures, it took no action, even though (according to NuVasive's executive vice president and general counsel) NuVasive had an obligation to determine the accuracy of the disclosures and Taylor's conduct was not acceptable to NuVasive. From this, the jury could infer NuVasive and Taylor would do whatever was necessary for Taylor, under the auspices of UCSD, to serve as NuVasive's clinical investigator for the NeuroVision device.

From the foregoing, substantial evidence of a common purpose exists — namely, to convince patients (like Kitrosser) to undergo a surgical procedure that involved the use of a NeuroVision device from which both NuVasive and Taylor could profit. As the following evidence substantiates, the mechanism or vehicle to effect this common purpose was the misrepresentation regarding the NeuroVision device — namely, with the NeuroVision device, nerve safety would be "ensured."

First, according to Kitrosser, Taylor expressly told her that "with his [NeuroVision] monitoring device, there would be no risk of nerve damage, *nerve safety was ensured*." (Italics added.) This was in contrast to her prior back surgery in 1993

21

when, according to Kitrosser, "there was no device that would guarantee or ensure the safety of your nerves." Indeed, Taylor conceded that he "might have said" to Kitrosser that the NeuroVision device would " '*help ensure*' " her nerve safety. (Italics added.)

NuVasive communicated the same misrepresentation in the two XLIF pamphlets that it prepared — with the express purpose and understanding that they would be provided to patients like Kitrosser. Consistently, NuVasive prepared and distributed to surgeons like Taylor a brochure instructing them how best to use and distribute the XLIF pamphlets to their prospective spine surgery patients. A NuVasive salesperson personally explained to Taylor *why* he should use them and *how* he could customize them with his name and contact information.[13]

In 2008 in response to Kitrosser's inquiry, Taylor sent Kitrosser the two XLIF pamphlets — each customized with Taylor's name and contact information. One XLIF pamphlet provides in part: "During spine surgery it is important to protect the nerves associated with your spinal column. . . . The NeuroVision Nerve Monitoring System provides real-time, precise and reliable feedback to *ensure your nerve safety*." (Italics added.) Kitrosser was impressed by this language in the XLIF pamphlet because, according to her, "it was exactly what he told me."[14] The second XLIF pamphlet —

---

[13]   Following this oral and written advice from NuVasive, between June 2007 and October 2008, Taylor ordered — and paid to have customized — more than 1,000 XLIF pamphlets.

[14]   This first pamphlet also represents that the "NeuroVision System has been used successfully in over 60,000 spinal surgeries," which "reinforced everything that [Taylor] said." However, NuVasive's director of marketing admitted that the "60,000" figure

which begins with a one-page letter that opens with "Dear valued patient" and closes with Taylor's name and contact information — provides in part under a description of what to expect: "Finally you will be prepared for intraoperative nerve monitoring — this will *ensure safe approach to the spine*." (Italics added.) Kitrosser confirmed that "[e]nsur[ing] safe approach to the spine" was consistent with what Taylor had told her.[15] Significantly, NuVasive's XLIF brand manager, who was also SOLAS's support manager during the 2006-2008 time period — and, during discovery, the person NuVasive designated as most knowledgeable regarding the SOLAS customized patient education brochures, including the drafting of the XLIF pamphlets at issue — testified that Taylor was "probabl[y] . . . one of the surgeons that I did communicate with to review the language in the materials, sure."

Both Taylor and NuVasive knew that their representations about the NeuroVision device were untrue. In a portion of Taylor's videotaped deposition shown to the jury, Taylor admitted he could not "ensure a hundred percent of anything in surgery." Likewise, since at least 2005 — when NuVasive submitted a "risk analysis" to the FDA,

---

represented only NuVasive's *sales of the disposable kits* used in the XLIF surgeries and that "[t]here is no assurance" the surgeries in fact were "successful." NuVasive's marketing strategy, however, *was* successful: Kitrosser read and believed that the XLIF procedure had been "very successful" in "many, many, many surgeries, 60,000."

15    This second pamphlet also contains information regarding the human spine, describes in much greater detail the XLIF procedure and compares its benefits to other procedures. In going over much of what NuVasive wrote, Kitrosser again testified that the information in this pamphlet "was exactly what [Taylor] told me," thereby reinforcing *everything* Taylor had told her in person.

23

disclosing 28 different ways that the NeuroVision device can give false information to the surgeon, potentially resulting in permanent nerve injury — NuVasive has known it cannot "ensure" nerve safety. Indeed, NuVasive's president of global products and services and NuVasive's director of marketing both testified that the NeuroVision device could not "guarantee" safety during surgery; and NuVasive's own expert on medical device product development agreed that any representation that the NeuroVision device can eliminate the risk of a failure to detect nerves during surgery "would be false."

In sum, we have little difficulty concluding that inferences from the direct evidence support the finding that NuVasive and Taylor conspired to misrepresent the ability of NuVasive's NeuroVision device to ensure Kitrosser's nerve safety during the XLIF procedure.

NuVasive contends that, because it was not aware of Kitrosser specifically or of her consultation with Taylor, NuVasive cannot be found to be a coconspirator with Taylor. However, NuVasive's intent, agreement and awareness that Taylor misrepresent the NeuroVision device to patients generally includes Kitrosser specifically. NuVasive and Taylor communicated the same misrepresentation — NuVasive in written pamphlets and Taylor in oral consultations — and the fact that NuVasive encouraged Taylor to use the XLIF pamphlets in his consultations with patients like Kitrosser supports the inference that NuVasive intended that he communicate the misrepresentation to Kitrosser. NuVasive's reliance on *Holder*, *supra*, 267 Cal.App.2d 91, in support of its position is misplaced. In *Holder*, the defendant bank did not conspire with the realtors, because the bank officers merely passed on information provided by the realtors without

24

the intent to misrepresent the information the officers communicated to the plaintiffs. (*Holder*, at p. 108.) In contrast, here NuVasive consulted with Taylor regarding the language in the XLIF pamphlets, and NuVasive (in writing) and Taylor (orally) made the same representations and knew the other was doing so also. To the extent NuVasive is arguing that there is no evidence establishing that it knew what Taylor may have been telling Kitrosser and, accordingly, Taylor made independent representations to Kitrosser, NuVasive fails to credit the jury with inferring — especially given the circumstances surrounding the preparation and distribution of the XLIF pamphlets — more than mere coincidence in the identical oral and written misrepresentations made by Taylor and NuVasive, respectively.

NuVasive suggests that, because the jury found the written misrepresentations in the XLIF pamphlets were not a substantial factor in causing Kitrosser's harm, NuVasive is somehow insulated from a finding of a conspiracy with Taylor. However, the finding of lack of causation on *direct liability* for NuVasive's alleged fraud is irrelevant to the determination whether Taylor and NuVasive *formed a conspiracy* (by which NuVasive is jointly liable for the fraud of its coconspirator Taylor). At best, the finding supports an argument that the coconspirators cannot be found liable for the misrepresentations made *by NuVasive*; but the finding has no effect on whether a conspiracy existed between NuVasive and Taylor and, accordingly, whether NuVasive can be found liable for the misrepresentations made *by Taylor*. (See 5 Witkin, *supra*, Torts, § 45, p. 111 [once there is a finding of a conspiracy, "each member may be held responsible as a joint tortfeasor, regardless of whether that member directly participated in the act"].)

25

In its reply, NuVasive argues that, because there is no "plausible motive" for NuVasive to conspire with Taylor, any inference of a conspiracy is not reasonable. By not raising this argument in its opening brief, NuVasive has forfeited this argument. (*Doe v. California Dept. of Justice* (2009) 173 Cal.App.4th 1095, 1115 (*Doe*) [" ' "Obvious considerations of fairness in argument demand that the appellant present all of his points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his opportunity to answer it or require the effort and delay of an additional brief by permission." ' "].) In any event, even without input from Kitrosser, the response is simple and straightforward: NuVasive's "plausible motive" was continued business and financial gain. NuVasive and Taylor both benefited from the use of the NeuroVision device in surgeries, like Kitrosser's, because its continued use and success meant more sales of the device — with increased direct income to NuVasive and increased royalties (and equity interest in NuVasive) to Taylor — and more "successful" surgeries, as NuVasive boasted in one of its XLIF pamphlets. Relying on *Matsushita Electric Industrial Co. v. Zenith Radio Corp.* (1986) 475 U.S. 574, 588, NuVasive suggests that because the conspiracy here was " 'economically irrational and practically infeasible,' " there is no substantial evidence to support the finding of a conspiracy. However, the language NuVasive quotes means only that a conspiracy must not be inferred where the defendant "had no motive to engage in the alleged . . . conspiracy" (*ibid.*); and, as we just explained, the evidence and inferences from the evidence are sufficient to substantiate that both NuVasive and Taylor had a significant motive here.

Substantial evidence supports the jury's finding of a conspiracy.[16]

B.    *The Special Verdict Is Not Fatally Defective*

1.    *The Special Verdict Form Is Not Missing a Necessary Finding*

NuVasive contends that, because the special verdict does not contain a specific finding that Taylor misrepresented the NeuroVision device, the verdict is fatally defective, and the order denying the motion for judgment JNOV must be reversed.  We disagree.

NuVasive and Kitrosser stipulated to the use of a special verdict form that was given to the jury.

The special verdict form is divided into five parts:  Part 1: intentional misrepresentation *by NuVasive*;  Part 2: intentional misrepresentation *by [Taylor] pursuant to a conspiracy with NuVasive*;  Part 3: negligence per se;  Part 4: breach of express warranty; and  Part 5: damages.  (Italics added.)  At issue in this appeal is Part 2, which provides as follows:

> "**Part 2:  Intentional Misrepresentation by William Taylor, M.D. Pursuant to a Conspiracy with NuVasive**
>
> "1.    Did William Taylor, M.D. make any false representation(s) of one or more important facts to Brenda Kitrosser?
>
>      __x__  Yes          ____  No
>
> "If your answer is 'Yes,' then answer the next question.  If you answered 'No,' then go to Part 3.

---

16    In light of our conclusion, we need not decide whether NuVasive waived its substantial evidence argument by failing to set forth all material facts in its opening brief on appeal.

"2.     Did William Taylor, M.D. either know that any of his representation(s) were false, or did he make any representations recklessly and without regard for the truth?

                    __x__  Yes              ____  No

"If your answer is 'Yes,' then answer the next question.  If you answered 'No,' then go to Part 3.

"3.     Did William Taylor, M.D. intend that Brenda Kitrosser rely on any of his misrepresentation(s)?

                    __x__  Yes              ____  No

"If your answer is 'Yes,' then answer the next question.  If you answered 'No,' then go to Part 3.

"4.     Did Brenda Kitrosser reasonably rely on any of William Taylor, M.D.'s misrepresentation(s)?

                    __x__  Yes              ____  No

"If your answer is 'Yes,' then answer the next question.  If you answered 'No,' then go to Part 3.

"5.     Was Brenda Kitrosser harmed?

                    __x__  Yes              ____  No

"If your answer is 'Yes,' then answer the next question.  If you answered 'No,' then go to Part 3.

28

"6.     Was Brenda Kitrosser's reliance on William Taylor, M.D.'s misrepresentation(s) a substantial factor in causing harm to Brenda Kitrosser?

__x__ Yes            ____ No

"If your answer is 'Yes,' then answer the next question.  If you answered 'No,' then go to Part 3.

"7.     Was NuVasive aware that William Taylor, M.D. planned to make any false representation(s) about NuVasive's NeuroVision device to patients including Brenda Kitrosser?

__x__ Yes            ____ No

"If your answer is 'Yes,' then answer the next question.  If you answered 'No,' then go to Part 3.

"8.     Did NuVasive agree with William Taylor, M.D., and intend that William Taylor, M.D., make any false representation(s) about NuVasive's NeuroVision device to patients including Brenda Kitrosser?

__x__ Yes            ____ No

"If your answer is 'Yes,' then answer the next question.  If you answered 'No,' then go to Part 3.

"9.     Do you find, by clear and convincing evidence, that any employee or agent of NuVasive engaged in malicious, oppressive or fraudulent conduct by conspiring to make any of the intentional misrepresentation(s)?

____ Yes            __x__ No

"If your answer is 'Yes,' then answer the next question.  If you answered 'No,' then go to Part 3."

Omitted questions 10 through 12 dealt with punitive damages.

29

NuVasive argues that the difference in the way Taylor's misrepresentations are described in question 1 ("any false representation(s)") and the way they are described in questions 7 and 8 ("any false representation(s) about NuVasive's NeuroVision device") renders the verdict fatally defective. That is to say, the false representations identified in questions 7 and 8 are limited to those "about NuVasive's NeuroVision device," whereas the false representations identified in question 1 could include some that are *unrelated to the NeuroVision device*.[17] Thus, NuVasive's argument continues, because the false representations within the scope of questions 7 and 8 are not necessarily coextensive with the false representations within the scope of question 1, the special verdict omits an essential factual element — namely, that NuVasive agreed and intended that Taylor make the *same* misrepresentation that the jury found had harmed Kitrosser.

a. *Law*

When a special verdict is used, "the jury find[s] the facts only, leaving the judgment to the Court. The special verdict must present the conclusions of fact as established by the evidence . . . ; and those conclusions of fact must be so presented as that nothing shall remain to the Court but to draw from them conclusions of law." (Code Civ. Proc., § 624.)

---

[17] In particular, NuVasive refers to testimony at trial suggesting that Taylor misrepresented to Kitrosser that rods and screws would not be placed in her spine, that the XLIF procedure was effective in treating scoliosis, and that the surgery would be successful and make her feel better. NuVasive also refers to evidence of Taylor's failure to disclose to Kitrosser his financial relationship with NuVasive, but there was no issue of nondisclosures at trial, only affirmative misrepresentations.

"Unlike a general verdict (which merely *implies* findings on all issues in favor of the plaintiff or defendant), a special verdict presents to the jury each ultimate fact in the case." (*Falls v. Superior Court* (1987) 194 Cal.App.3d 851, 854.) Because " '[t]he jury must resolve all of the ultimate facts presented to it in the special verdict, . . . [t]he requirement that the jury must resolve every controverted issue is one of the recognized pitfalls of special verdicts.' " (*Myers Building Industries, Ltd. v. Interface Technology Inc.* (1993) 13 Cal.App.4th 949, 959-960, citation omitted (*Myers*).) Accordingly, a "special verdict is 'fatally defective' if it does not allow the jury to resolve every controverted issue." (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325 (*Saxena*).)

In *Myers*, for example, the court considered a challenge to an award of punitive damages because the special verdict form included findings only for plaintiff's cause of action for breach of contract. (*Myers*, *supra*, 13 Cal.App.4th at p. 958.) "No special verdict findings were submitted to the jury on any cause of action except breach of contract, even though [plaintiff] had pleaded a cause of action against [defendant] for breach of fiduciary duty and fraud. The special verdict read, on its face, as a net award of compensatory damages for breach of contract with a special finding that [defendant] had acted with 'oppression, fraud, or malice' towards [plaintiff]." (*Ibid.*) Because "the jury was neither requested to nor did it make the necessary factual findings for a fraud or other tort cause of action," the special verdict was fatally defective with regard to the award of punitive damages. (*Id.* at p. 960.)

In *Saxena*, the family of the decedent was awarded damages from the decedent's physician following a jury trial on causes of action for wrongful death, negligence and

31

battery. (*Saxena*, *supra*, 159 Cal.App.4th at p. 320.) Since the claim for battery required the family to prove that the physician had acted without the decedent's consent, the special verdict was fatally defective for failing to require such a finding; "it 'is like a puzzle with pieces missing; the picture is not complete.' " (*Id.* at p. 326.) On that basis, the order denying the physician's motion for JNOV was reversed with directions that the trial court enter judgment in favor of the physician on the battery claim. (*Id.* at pp. 335-336.)

Similarly, in *Behr v. Redmond* (2011) 193 Cal.App.4th 517 (*Behr*), the plaintiff pleaded causes of action for, among others, fraud by concealment and fraud by misrepresentation. (*Id.* at p. 531.) The jury returned a special verdict, awarding damages on both causes of action. (*Ibid.*) However, the special verdict form "did not call for a finding (and the jury did not make any finding) as to whether [the defendant] made any affirmative misrepresentation" — a required element of the cause of action for fraud by misrepresentation. (*Ibid.*) Since the verdict therefore reflected "the absence of a factual finding necessary to support a cause of action" for fraud by misrepresentation, that cause of action was unsupported by the jury's verdict, and judgment on that claim was reversed. (*Id.* at pp. 531, 538.)

b. *Standard of Review*

Ordinarily, when reviewing the denial of a motion for a JNOV, "the standard of review is whether any substantial evidence — contradicted or uncontradicted — supports the jury's conclusion." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) Here, however, because the issue presented deals solely with the validity of a

32

special verdict, we are required to "analyze the special verdict form de novo." (*Saxena*, *supra*, 159 Cal.App.4th at p. 325; accord *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 285 (*Trujillo*) ["The [special] verdict's correctness must be analyzed as a matter of law."].)  Where (as here) a special verdict is used, "we will not imply findings in favor of the prevailing party.  [Citation.]  If a fact necessary to support a cause of action is not included in such a special verdict, judgment on that cause of action cannot stand." (*Behr*, *supra*, 193 Cal.App.4th at p. 531.)[18]

        c.     *Analysis*

Initially, Kitrosser argues that, by having stipulated to the use of the special verdict — as opposed to mere acquiescence in or failure to object to the form — NuVasive waived (or forfeited) its right to challenge the verdict.[19]  She raised the same argument in opposition to NuVasive's motion for JNOV in the trial court.  Although the record does not contain the trial court's ruling on the waiver issue, the court implicitly found no waiver, since the court reached the merits of (and denied) NuVasive's motion.  Because we agree with the trial court's ruling on the merits, we express no opinion on the trial court's ruling on waiver.

---

18    A recent case holds that "a defective special verdict form is subject to harmless error analysis," rather than automatic reversal.  (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1244.)  Because we will conclude the special verdict form here is not defective, we need not consider this potential conflict in authority.

19    Kitrosser did not present this issue as one of estoppel or invited error.

As we will explain, unlike in *Myers*, *Saxena* and *Behr* discussed in part II.B.1.a., *ante*, the special verdict form here does not reflect the complete absence of a factual finding necessary for Kitrosser's claim for intentional misrepresentation by conspiracy. NuVasive identifies at most a discontinuity between the questions, which requires us to interpret the form.

NuVasive contends the special verdict form lacks the necessary finding that Taylor made the *same* false representation that NuVasive agreed and intended him to make. NuVasive directs us first to question 8, which establishes that NuVasive agreed with and intended that Taylor made "*false representation(s) about NuVasive's NeuroVision device* to patients including Brenda Kitrosser," and then to question 1, which establishes that Taylor only made "*false representation(s) of one or more important facts* to Brenda Kitrosser." (Italics added.) NuVasive argues that there is no way of knowing whether Taylor's misrepresentations to Kitrosser concerned the NeuroVision device, the subject of the alleged conspiracy.

In response, Kitrosser counters that, *when read in order*, Taylor's misrepresentations included, even if not necessarily limited to, the NeuroVision device: from question 1, the jury believed that Taylor misrepresented "one or more important facts" to Kitrosser; from question 7, the jury believed that NuVasive "[w]as [] aware" that Taylor "planned" to misrepresent the NeuroVision device to Kitrosser; and from question 8, the jury believed that NuVasive "agree[d] with" and "intended that" Taylor misrepresent the NeuroVision device to Kitrosser.

Read in either order, the special verdict contains findings sufficient to establish a conspiracy to intentionally defraud; *no element is missing.* Once again, *Kidron* tells us: " '[T]he basis of a civil conspiracy is the formation of a group of two or more persons who have agreed to a common plan or design to commit a tortious act.' [Citations.] . . . [T]he conspiring defendants must also have actual knowledge that a tort is planned and concur in the tortious scheme with knowledge of its unlawful purpose." (*Kidron*, *supra*, 40 Cal.App.4th at p. 1582.) Applying the special verdict's findings to this standard, we see: question 8 establishes the requisite " 'formation of a group of two or more persons who have agreed to a common plan or design to commit a tortious act' "; question 7 establishes that NuVasive "ha[d] actual knowledge that a tort [wa]s planned"; question 8 establishes that NuVasive "concur[red] in the tortious scheme"; and question 7 establishes that NuVasive had "knowledge of [the conspiracy's] unlawful purpose." (*Ibid.*) Finally, question 1 establishes that one of the coconspirators, Taylor, communicated "false misrepresentation(s)" of important facts to Kitrosser.[20]

Thus, without inferring any factual findings — which we may not (*Behr*, *supra*, 193 Cal.App.4th at p. 531 ["we will not imply findings in favor of the prevailing party"]) — the special verdict form contains all findings necessary for a conspiracy that validates the amended judgment. Rather than a fatal deficiency, the special verdict form here reflects at most an ambiguity: Taylor made misrepresentations to Kitrosser, but the findings are unclear as to whether they were misrepresentations within the scope of the

[20]     NuVasive raises no issues as to causation or damages.

35

conspiracy.  Notably — and in contrast to the true "missing elements" authorities on which NuVasive relies[21] — the special verdict form here does not *preclude* an interpretation in which Taylor's misrepresentations were within the course and scope of the conspiracy.  (*Amerigraphics, Inc. v. Mercury Casualty Co.* (2010) 182 Cal.App.4th 1538, 1557 (*Amerigraphics*) [on insurance bad faith claim, special verdict form that awarded punitive damages but had no finding regarding compensatory damages affirmed, because the special verdict form "did not *preclude* a finding of punitive damages"].)

NuVasive insists that "this is a 'missing element [verdict]' case" and there is "no ambiguity [in the verdict] that needed clarification"; "[t]o be clear, NuVasive has appealed because the special verdict in this case is *missing an essential element*."  (Some bolding and initial capitalization omitted; italics in original.)  Accordingly, NuVasive presents no reply to Kitrosser's argument regarding the interpretation of the potential ambiguities in the special verdict form here.  For this reason, we could end our

---

[21]     In *Myers*, *Saxena* and *Behr*, for example, none of the special verdict forms contained a question, and thus a finding, on one of the necessary elements of the claim submitted to the jury.  In *Myers*, the jury awarded punitive damages, but there was no question that allowed the jury to find that the cross-defendant had committed a tort. (*Myers*, *supra*, 13 Cal.App.4th at p. 956 [jury found cross-defendant breached a contract and acted with oppression, fraud or malice].)  In *Saxena*, the jury found in favor of the plaintiffs on their claim against a physician for medical battery, but there was no question on the special verdict form that allowed the jury to find that the physician performed the procedure without the patient's consent — a requirement to recover for medical battery. (*Saxena*, *supra*, 159 Cal.App.4th at pp. 324, 326.)  In *Behr*, the special verdict form failed to include a finding on "the fact of misrepresentation" — a "finding necessary to support [the] cause of action."  (*Behr*, *supra*, 193 Cal.App.4th at p. 531.)

Although NuVasive also relies on *Trujillo*, that case does not involve a "missing element"; it deals with an inconsistent verdict in which the jury found no discrimination but nonetheless awarded damages. (*Trujillo*, *supra*, 63 Cal.App.4th at p. 283.)

36

discussion here. (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 ["Although our review . . . is de novo, it is limited to issues which have been adequately raised and supported in [the appellant's] brief."].) However, we exercise our discretion to provide our reasons for concluding that, based on the record in this appeal, the special verdict returned by the jury is not ambiguous.

Where a special verdict form is merely ambiguous (i.e., not missing an element), so long as it is "not 'hopelessly ambiguous,' " we can look at the pleadings, evidence, jury instructions and closing arguments in interpreting the verdict so as to clarify any ambiguity. (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092 (*Zagami*); see *Amerigraphics*, *supra*, 182 Cal.App.4th at p. 1558.) However, we may not merely " 'choose between inconsistent answers.' " (*Zagami*, at p. 1092.)

With regard to the pleadings, the *only* intentional misrepresentations Kitrosser alleged in the fourth amended complaint concerned "the safety, reliability, precision and efficacy of the NeuroVision nerve detection and monitoring device" and, in particular, whether it would "ensure" either "nerve safety" or "a safe approach to [Kitrosser's] spine" during the XLIF procedure.

With regard to the evidence, NuVasive does not contend that the record fails to support a finding that Taylor misrepresented the NeuroVision device to Kitrosser. Instead, NuVasive refers us to *other* misrepresentations that Taylor allegedly made to Kitrosser: rods and screws would not be placed in her spine; the XLIF procedure was effective in treating scoliosis; and the surgery would be successful and make her feel

37

better.  We agree that Kitrosser did testify as to those misrepresentations, although we note that she did so only in passing and they were not the focus of her case.

With regard to the jury instruction on conspiracy, the court adapted CACI No. 3600 without objection.[22]  Thus, the instruction required findings that Taylor "committed *a fraud*," that NuVasive was aware Taylor planned to "to commit *fraud*" and that NuVasive "agreed with" Taylor and "intended that *the fraud* be committed."  (Italics added.)  As instructed, therefore, the jury could find NuVasive liable for conspiracy only if NuVasive was aware that Taylor planned to commit, and agreed and intended that Taylor commit, "the fraud" identified earlier in the instruction.  Indeed, the special

---

[22]    The instruction is entitled "Conspiracy — Essential Factual Elements" and provides as follows:

"Brenda Kitrosser claims that she was harmed by William R. Taylor, M.D.'s fraud and that Defendant NuVasive, Inc. is responsible for the harm because it was part of a conspiracy to commit fraud.  A conspiracy is an agreement by two or more persons to commit a wrongful act.  Such an agreement may be made orally or in writing or may be implied by the conduct of the parties.

"If you find that William R. Taylor, M.D. committed a fraud that harmed Plaintiff, then you must determine whether Defendant NuVasive, Inc. is also responsible for the harm.  Defendant NuVasive, Inc. is responsible if Plaintiff proves both of the following:

"1.    That Defendant NuVasive, Inc. was aware that William R. Taylor, M.D. planned to commit fraud; and

"2.    That Defendant NuVasive, Inc. agreed with William R. Taylor, M.D. and intended that the fraud be committed.

"Mere knowledge of a wrongful act without cooperation or an agreement to cooperate is insufficient to make Defendant responsible for the harm.

"A conspiracy may be inferred from circumstances, including the nature of the acts done, the relationships between the parties, and the interests of the alleged coconspirators.  Plaintiff is not required to prove that Defendant personally committed a wrongful act or that they [*sic*] knew all the details of the agreement or the identities of all the other participants."  (See Judicial Council of Cal. Civ. Jury Instns. (2003-2004), CACI No. 3600.)

verdict form tracks the jury instruction (to which NuVasive stipulated) almost verbatim. NuVasive does not contend the instruction is erroneous, and we express no opinion on the instruction. For purposes of determining whether the special verdict form is ambiguous, however, the special verdict form and jury instruction are consistent.

Finally, and most persuasively, counsel's closing arguments suggest only one fraudulent misrepresentation by Taylor for purposes of the conspiracy — namely, that the NeuroVision device would ensure Kitrosser's nerve safety. As Kitrosser's attorney was walking the jury through the special verdict form, when he got to Part 2, intentional misrepresentation pursuant to a conspiracy, he initially read the first question ("Question number 1. Did Dr. Taylor make any false representations of one or more important facts [to] Brenda Kitrosser?"), answered it ("Absolutely.") and then (1) played a short video clip from Taylor's deposition testimony of one question and one answer that *only* dealt with Taylor having falsely represented to Kitrosser that "*intraoperative nerve monitoring* [through use of the NeuroVision device, as represented in one of NuVasive's XLIF pamphlets] *will ensure safe approach to the spine*," and (2) reminded the jury that Taylor had "*admit*[*ted*] *that he may have said 'ensure your nerve safety*,' and Ms. Kitrosser says he did." (Italics added.) Consistently, as NuVasive's attorney tried to persuade the jury there was no conspiracy, he argued in the context of Part 2, question 1 of the special verdict form: "Did William Taylor, M.D. make any false representations of one or more important facts to Ms. Kitrosser? What's the evidence on that? If — to answer yes to this question that Dr. Taylor in effect committed fraud, you have to believe that *he guaranteed the safety of Ms. Kitrosser's nerves*." (Italics added.) Neither attorney

39

mentioned any other misrepresentation by Taylor in the context of Part 2, question 1, of the special verdict form.

Based on our review of the pleadings, evidence, jury instructions and closing arguments, we are not forced to choose between inconsistent interpretations of Part 2 of the special verdict form in our effort to clarify an ambiguity. (See *Zagami*, *supra*, 160 Cal.App.4th at p. 1092; *Amerigraphics*, *supra*, 182 Cal.App.4th at p. 1558.) Here, those sources, especially counsel's closing arguments, support only one finding: Taylor misrepresented to Kitrosser that the NeuroVision device would ensure nerve safety during the XLIF procedure.

2. *The Special Verdict Form Is Not Inconsistent*

NuVasive contends that, even if the special verdict form is not missing an element of the claim for conspiracy, the special verdict form still does not support the amended judgment. According to NuVasive, because the jury expressly found that NuVasive's written misrepresentations concerning the NeuroVision device in the XLIF pamphlets were not a substantial factor in causing harm to Kitrosser, Kitrosser's reliance on the identical oral misrepresentation by Taylor cannot have been a substantial factor in causing the harm. Emphasizing that Kitrosser understood Taylor to be the source of both the written and oral misrepresentations, NuVasive characterizes this purported error as an inconsistency in the special verdict form that requires a reversal of the amended judgment and a new trial. As we explain, we do not see any inconsistency.

In order for findings in a special verdict to be inconsistent, they must be based on the same evidence but determine a material issue in a contradictory way. (*Cavallaro v.*

40

*Michelin Tire Corp.* (1979) 96 Cal.App.3d 95, 101.) "A special verdict is inconsistent if there is *no possibility* of reconciling its findings with each other." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357, italics added.) In determining whether the findings of a special verdict are inconsistent, we review the special verdict de novo. (*Id.* at p. 358.)

In presenting its argument, NuVasive asks, "Why would a misrepresentation about the NeuroVision made orally by Dr. Taylor be the cause of injury when the same misrepresentation in writing was not?" Even if we assume that the two sets of misrepresentations were identical and from the same source, the form, format and setting of each set of communications were quite different. The first set was delivered orally from a doctor to his patient in a confidential face-to-face setting in his office, whereas the second set was delivered in two written documents delivered to the patient's residence and read by the patient on her own at her leisure. We have little trouble concluding that, given these differences, a jury reasonably could find that Kitrosser's reliance on one set of the misrepresentations was a substantial factor in causing her harm, but the second set was not — regardless of Kitrosser's understanding that Taylor had made all of the representations. At a minimum, differences in comprehension of identical statements communicated orally and in writing are a sufficient basis on which a jury could reach different findings based on the form of the communication.

Accordingly, the special verdict form's findings as to causation in Parts 1 and 2 are not inconsistent.

C.	*The Trial Court Did Not Err in Admitting Evidence Related to Taylor's 700-U Forms or the Resulting FPPC Decision*

NuVasive argues that the trial court erred in allowing into evidence testimony and documents related to the UCSD 700-U forms and the FPPC Decision.   More specifically, NuVasive argues that the admission of such evidence was irrelevant under Evidence Code section 352 and "unfairly injected the suggestion of sinister intent."[23]

Prior to trial, the court granted Taylor's motion in limine to preclude anyone "from testifying to, referring to or otherwise introducing any evidence regarding the [FPPC Decision]."[24]  (Bolding omitted.)  At trial, however, during Taylor's testimony, the court allowed admission of all three of Taylor's 700-U forms — over NuVasive's relevance objections and following a sidebar conference at which the court ruled the two later forms were relevant to the conspiracy claim based on establishing Taylor's intent and motive under Evidence Code section 1101, subdivision (b).[25]  During Kitrosser's cross-examination of NuVasive's executive vice president and general counsel, the court also

_____

[23]    "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  From this list of potential bases of irrelevance, NuVasive presents arguments only of " 'undue prejudice.' "

[24]    NuVasive says it joined in Taylor's motion, but provides no record reference, and we cannot find a joinder in the record.  Kitrosser does not disagree with NuVasive's representation.

[25]    Evidence Code section 1101, subdivision (b) allows for the admission of "evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, . . . ) other than his or her disposition to commit such an act."

allowed evidence of and related to the FPPC Decision, following a sidebar conference at which the court was persuaded that NuVasive's direct examination of this witness had opened the door to allow the evidence that had been precluded by the in limine ruling.

We review a trial court's evidentiary rulings, especially those that turn on the relevance of the proffered evidence, for an abuse of discretion. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281.) A trial court abuses its discretion only when, in its exercise, the ruling is arbitrary or the trial court " 'exceeds the bounds of reason, all of the circumstances before it being considered.' " (*Ibid.*) As the appellant, NuVasive bears the burden of establishing both "a clear case of abuse and miscarriage of justice." (*Ibid.*)

The evidence related to the 700-U forms was relevant to show the nature of the relationship between Taylor and NuVasive, the two alleged coconspirators. Taylor's false statements tended to show, among other things, his intent to lie in order to hide his relationship with NuVasive and to continue promoting the use of the NeuroVision device. They also established a benefit to NuVasive by allowing NuVasive to use research conducted under the auspices of UCSD, as the FPPC ultimately found. Finally, NuVasive's knowledge of the misrepresentations without having taken any action — even after Kitrosser's surgery — further confirms NuVasive's participation in the ongoing conspiracy. We are not persuaded by NuVasive's argument that the court abused its discretion in admitting this evidence related to the 700-U forms.[26]

---

[26] In its reply brief, NuVasive contends that the court violated a precondition for admitting the 700-U forms discussed during the in limine proceedings — namely, the admission of sufficient other evidence tending to show a conspiracy. Once again, by not

Kitrosser offered the FPPC Decision during her cross-examination of NuVasive's executive vice president and general counsel, whom NuVasive called in part "to testify to why [NuVasive] didn't sever the relationship with Dr. Taylor when they found out that he had issues with UCSD." Indeed, on direct examination by NuVasive, the witness testified both that he was aware Taylor had misrepresented under penalty of perjury his financial relationship with NuVasive on his 700-U forms and that he (the witness) had investigated the situation and concluded Taylor had merely committed an " 'honest mistake.' " The witness explained that his investigation included a conversation with Taylor in which Taylor had told the witness that the matter "had been resolved." During a sidebar conference on whether the court would allow evidence of the FPPC Decision, the court ruled that, once NuVasive attempted to defend what it did based on the formal resolution of the matter, Kitrosser would be allowed to cross-examine the witness on his knowledge of how the matter had been resolved — namely, through the ruling and effect of the FPPC Decision.[27] We are not persuaded by NuVasive's argument that the court abused its discretion in admitting evidence relating to the FPPC Decision.[28]

raising this argument in its opening brief, NuVasive has forfeited this argument. (*Doe*, *supra*, 173 Cal.App.4th at p. 1115.) In any event, "the trial court's *in limine* ruling is necessarily tentative because the court retains discretion to make a different ruling as the evidence unfolds" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1174); and even assuming the trial court's precondition has any application, ample evidence tending to show a conspiracy was received at trial, as we have discussed at part II.A., *ante*.

[27]    In explaining its ruling, the court expressed surprise at NuVasive's examination of this witness given the in limine ruling: "Honestly, I don't know . . . why you would go down this road with showing the [NuVasive] investigation that was conducted. . . . [T]he reason you got the . . . initial [in limine] ruling . . . was we're not trying an FPPC case

44

Finally, given the other substantial evidence of conspiracy (see pt. II.A., *ante*), we are not convinced — and, indeed, NuVasive makes no effort to convince us — that it would have received a different result if evidence related to the 700-U forms or the FPPC Decision had not been admitted. (Cal. Const., art. VI, § 13 ["miscarriage of justice" required for a reversal]; Evid. Code, § 353, subd. (b) [reversal only if "the error or errors complained of resulted in a miscarriage of justice"]; Code Civ. Proc., § 475 [no reversal unless "a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed"]; *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069 [" ' "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' "].)

Accordingly, NuVasive has not met its burden of establishing that the trial court abused its discretion in its evidentiary rulings associated with the 700-U forms or the FPPC Decision.

---

here. *But when you go in to defending NuVasive by saying they did everything they could and considered everything they could, the fact is they considered* [*the FPPC judgment*], and they still didn't do anything." (Italics added.)

28    In its reply, NuVasive suggests that, if the court had not erred in admitting the 700-U forms into evidence, NuVasive would not have had to explain about its investigation of Taylor. Once again, by not raising this argument in its opening brief, NuVasive has forfeited this argument. (*Doe*, *supra*, 173 Cal.App.4th at p. 1115.) In any event, the trial court did not abuse its discretion in admitting evidence of the 700-U forms. (See text in pt. II.C., *ante*.)

DISPOSITION

The amended judgment and order denying NuVasive's motion for JNOV are affirmed.[29]  Kitrosser is entitled to recover her costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)

IRION, J.

WE CONCUR:

HUFFMAN, Acting P. J.

AARON, J.

---

[29]     NuVasive has expressed the concern that an affirmance of the amended judgment may set "a troublesome precedent" by allowing what NuVasive describes as "productive cooperation between physicians and medical device companies" to become evidence of a conspiracy to mistreat patients.  (Some capitalization omitted.)  We express no opinion on what may be an industry practice that includes "productive cooperation between physicians and medical device companies."  This opinion is based on the evidence in the record in this appeal as to the interaction between NuVasive and Taylor during the relevant time period and how the jury determined their association affected Kitrosser.